Roger Lee McQUEEN, Appellant,

v.

Harold R. SWENSON, Warden,
Appellee.

No. 73–1278.

United States Court of Appeals,
Eighth Circuit.

Submitted Dec. 10, 1973.

Decided June 4, 1974.

Rehearing and Rehearing En Banc
Denied July 18, 1974.

Michael Gross, Clayton, Mo., for appellant.

Steven D. Hoyne, Asst. Atty. Gen., Jefferson City, Mo., for appellee.

Before BRIGHT and STEPHENSON, Circuit Judges, and STUART, District Judge.*

BRIGHT, Circuit Judge.

Roger Lee McQueen was charged with first-degree murder in the shooting death of one George Francis in the fall of 1963 and was tried in the Circuit Court of the City of St. Louis, Missouri, approximately a year later. On October 2, 1964, McQueen was found guilty of second-degree murder by a jury and subsequently sentenced to life imprisonment. After various appeals and collateral attacks on his conviction in state courts,[1] he petitioned for a writ of ha-

---

* WILLIAM C. STUART, District Judge, Southern District of Iowa, sitting by designation.

1. On his initial appeal to the Missouri Supreme Court, the judgment was affirmed. State v. McQueen, 399 S.W.2d 3 (Mo. 1966). This decision was later set aside, however, because McQueen as an indigent was not furnished counsel on appeal. The record is unclear as to why no attorney appeared for the defendant. Following the trial, petitioner's original trial counsel, Hale W. Brown— whose trial representation is here challenged —stated to the court at a hearing on McQueen's petition to appeal as a poor person: "I have agreed to go on up with this case at no cost on my part." The court granted the motion, but there is no indication in the record as to what happened to Mr. Brown. In the first appeal, the Missouri Supreme Court followed the procedure it normally employed at that time when a defendant was unrepresented at the appellate level; the court simply considered the contentions originally raised in the defendant's motion for a new trial as allegations of error.

Upon resubmission to the state Supreme Court with new counsel, the judgment was again affirmed. State v. McQueen, 431 S. W.2d 445 (Mo. 1968). Prior to the second submission of the direct appeal, McQueen filed a motion under Missouri Supreme Court Rule 27.26 V.A.M.R. collaterally attacking his conviction on the ground that he had been denied effective assistance of counsel. On September 12, 1969, an evidentiary hearing on the motion was held in the Circuit Court for the City of St. Louis, Missouri. The trial court denied relief, and, in an opinion that provoked strong dissents from Justices Seiler and Donnelly, the Missouri Supreme Court affirmed. McQueen v. State, 475 S.W.2d 111 (Mo.1971).

beas corpus under 28 U.S.C. § 2254 in the United States District Court for the Eastern District of Missouri. Petitioner contended that his right to effective assistance of counsel—guaranteed to him in his state prosecution by the fourteenth amendment—was violated by his trial counsel's total failure to investigate the facts of the case.

The district court denied the petition without an evidentiary hearing in McQueen v. Swenson, 357 F.Supp. 557 (E. D.Mo.1973), and this appeal followed. We granted a certificate of probable cause, appointed counsel, and heard oral argument in this case because it presents a serious question about the parameters of the constitutional right to effective assistance of counsel. For reasons stated below, we reverse and remand for further proceedings.

## I.

A brief background of the testimony adduced at trial is useful. It was undisputed at the original trial and is undisputed in the instant proceedings that petitioner shot and killed a black homosexual, named George Francis, in the latter's apartment in St. Louis, Missouri, on the morning of October 23, 1963. At the original trial, McQueen relied on self-defense as a justification for the homicide, while the state spun a web of circumstantial evidence around him to negate that possibility.

According to the defense theory, McQueen had known the deceased since 1960. When McQueen was released from prison in 1963 after serving time on a narcotics charge, George Francis, who was employed as a librarian, offered to find him work. At the deceased's invitation, McQueen visited Francis' apartment late on the night before the shooting, but, for some reason, on arrival was told to return the next morning. When he did so, according to petitioner's version of the events, he encountered Francis in a drugged and drunken rage. At that point, the deceased—who outweighed McQueen by 60 or 65 pounds—

allegedly attacked the petitioner with a long metal shoehorn, threatening some sort of homosexual rape as revenge for McQueen's unintentional precipitation of a quarrel between Francis and the latter's homosexual lover, one Donald Cole. According to McQueen, when the deceased lunged towards him menacingly, McQueen picked up a revolver which had been lying on a nearby dresser top and shot George Francis. Because Francis kept coming towards him, McQueen shot him again, and then once again when neither of the first two shots halted the attack. Thereafter, McQueen asserted, he consumed a large quantity of narcotics which were in the deceased's bedroom, but had only a vague recollection of his subsequent actions during the next few days.

Other than the petitioner, there was no one alive at the time of trial who saw the actual shooting. McQueen alone testified for the defense, but the state—through a parade of 26 witnesses—attempted to establish five propositions which seemed to destroy petitioner's self-defense theory. These propositions and the proof from which they were extrapolated are as follows:

1) *McQueen brought the murder weapon with him to the deceased's apartment.* The revolver was undisputedly the property of one Mary Zoeller. At the trial she stated that she did not know the deceased, but had met the petitioner through her brother, Dr. Conrad Zoeller. She testified that she kept the pistol under the front seat of her car, that she had vaguely mentioned the existence of the pistol to McQueen, and that she discovered it missing several days after the shooting. As corroboration for the theory that McQueen stole the pistol and brought it with him to the deceased's apartment, the state introduced two shirts belonging to Mary Zoeller's brother—one of which was found in Francis' apartment and the other in McQueen's possession when he was apprehended. Dr. Zoeller testified that his sister took his shirts to the laundry reg-

ularly and that these shirts must have been taken from her car.[2]

2) *McQueen went to the deceased's apartment for the purpose of robbing him.* Various members of the deceased's family testified that Francis owned an expensive, diamond-encrusted wristwatch, which he took great pride in and which was seen in his possession prior to his death. Other witnesses testified that they observed the petitioner wearing such a watch on October 23, 24, and 25, 1963.[3] McQueen admitted the theft, but claimed that the theft was unpremeditated and occurred almost as a reflex action after the shooting.

3) *The shoehorn allegedly used by Francis to attack McQueen never existed.* Several police officers who had investigated the scene at the deceased's apartment testified that in searching the area they found no such shoehorn.

4) *McQueen revealed a consciousness of his guilt by fleeing the state.* Testimony was introduced that, around midnight on October 24, petitioner approached a motorist named James Fisk at a roadside cafe in Independence, Kentucky, and brandished a revolver, ordering Fisk to drive him towards Louisville. The car was stopped at a roadblock near Covington, Kentucky, and, after attempting to force a county patrol officer to accompany him, petitioner was disarmed and taken into custody.

5) *McQueen's self-defense theory was concocted long after the murder was committed.* Police officers, who interrogated McQueen after his apprehension, testified that, in response to the question, "Were you ever in the presence of George Francis?", McQueen answered: "Not to the best of my knowledge." The officers also testified that in response to the question, "Did you shoot George Francis?", McQueen denied it, saying, "Not to the best of my knowledge."[4]

Based upon this circumstantial evidence, the jury found McQueen guilty of second-degree murder.[5]

### II.

In 1969, an evidentiary hearing was held in connection with McQueen's Rule 27.26 motion in state court, collaterally attacking his conviction on the ground that he had been denied effective assistance of counsel at trial. The testimony at the hearing showed that, approximately two months after his apprehension, McQueen was confined in the Jefferson County jail in Hillsboro, Missouri, where a separate first-degree murder charge was pending.[6] At that time, a Jefferson County magistrate appointed an attorney from Kirkwood, Missouri, Hale W. Brown, to represent McQueen in the Hillsboro case. Shortly thereafter, Brown apparently volun-

---

2. At the original trial, McQueen asserted that the shirt belonging to Dr. Zoeller which was found in his possession when he was apprehended was one of several items of apparel given to him by the deceased after his release from prison.

3. The watch seen on McQueen's wrist inexplicably disappeared when petitioner was apprehended by police officers outside of Louisville, Kentucky.

4. According to McQueen, the only question asked was whether he had killed Francis, and, since he thought that he perhaps had only wounded him, he replied "Not to the best of my knowledge" to that question.

5. The indictment charged McQueen with first-degree murder in that he "feloniously, willfully, premeditatedly, deliberately, on purpose, and of his malice aforethought"

killed Francis. The lesser-included offense of second-degree murder is defined in the same manner except that the element of "deliberately" is absent. The court instructed the jury on this point as follows:

"Deliberately" means done in a cool state of the blood. It does not mean brooded over or reflected upon for a week, a day, or an hour, but it means an intent to kill executed by a party in a cool state of the blood, in furtherance of a formed design to gratify a feeling of revenge, or to accomplish some other unlawful purpose, and not under the influence of a violent passion suddenly aroused by some provocation.

6. The record does not make clear the present status of this second charge, but petitioner stated at the 27.26 hearing that he has not as yet been tried on it.

teered to act as McQueen's attorney in the St. Louis case as well, but he was not officially appointed to that case until September 24, 1964, four days before the trial.

There is some dispute as to how many visits Brown made to the Jefferson County jail to confer with McQueen and how much time he devoted to the case. According to McQueen, Brown visited him only twice during the period he was confined in Hillsboro between December 1963 and June 1964. According to McQueen, none of the conferences in Hillsboro related to the St. Louis case in any significant way. Some factual corroboration for this contention was offered by a fellow prisoner whose cell was next door to McQueen's. The witness, who was in the Hillsboro jail between March and July 1964, testified that he saw Brown only once during that period, that he could hear everything that was said, that the conference was only about the Hillsboro case, and that it lasted only 15 minutes.

McQueen testified further that Brown did not visit him at all, during the entire time in which he was confined in the St. Louis City Jail, between June 1964 and the time of the St. Louis trial in late September, and that it was not until the actual trial that McQueen was able to discuss the death of George Francis with his attorney. McQueen asserts that, at that time, he attempted to persuade Brown to investigate Dr. Zoeller whose sister owned the murder weapon and who, according to McQueen, knew the deceased and was himself a homosexual.[7]

Brown's testimony, on the other hand, emphasized that he visited Jefferson County approximately 37 or 38 times and talked to the petitioner in the county jail about seven times and in the city jail about one or two times. Brown estimated, however, that he spent about four-fifths of all that time working on the Hillsboro case which he expected to come to trial first. In answer to questions probing the manner in which he investigated the St. Louis case, Brown replied as follows:

Q: Did Roger tell you that Doctor Zoeller knew the deceased, the victim in the case?

A: I am sure he did, yes.

Q: Did you press that point or investigate it?

A: No. It wouldn't have much to do with shooting a man in the head.

Q: Now, Mr. Brown, did you interview any prosecution witnesses?

A: No, sir.

Q: Prior to trial? A. No, sir.

Q: Of course, there was a long list and the court file had a number of prosecuting witnesses?[8] A Yes, sir.

Q: You did not undertake to interview any prosecution witness? A No.

Q: Go to see them or try to interview them? A No.

Q: So you don't really know whether or not they would have talked to you prior to trial? A No. I have never been one to go out and interview them. I realize there is a statute that says they should give us their testimony, but I also found from other lawyers it looks like you are tampering with the State's witnesses when you talk to them. That becomes an issue in a trial. I don't think it is wor-

---

7. Dr. Zoeller testified at the trial that he did not know the deceased, but admitted knowing the defendant as an insurance salesman who had canvassed Zoeller's neighborhood. Defendant's attorney made no further inquiry relating to the witness' acquaintanceship with defendant or any possible relationship with the deceased, although, from his testimony at the 27.26 hearing, it appeared that he accepted McQueen's characterization of Dr. Zoeller's homosexuality.

8. Pursuant to Missouri Supreme Court Rule 24.17, the names of 41 witnesses were "endorsed" on the indictment. Rule 24.17 states:

When an indictment or information is filed the names of all material witnesses for the prosecution shall be endorsed thereon.

thy of a deposition. And I don't try to contact them. And like a policeman telling what is going on around the jail. And I try to shoot for my case. I never like to go out and interview State's witnesses. That is the duty of a detective or somebody to go to the Court and make an application. It is too subject to bribery offers. It puts you in a bad light. You can be accused of many things. I don't care to get into that.

Q: It is your position as a matter of policy you simply do not and did not in this case even attempt to interview any prosecuting witness? A No, I did not.

### III.

In denying McQueen's 27.26 motion after the evidentiary hearing, the state court in an unpublished opinion concluded as follows:

In view of the fact that the defendant stated to his counsel that he was present at the scene and that he did actually kill the deceased George Francis, and in view of the fact that there was no eyewitness to the actual killing by defendant of George Cooper Francis, it cannot be said that the defendant was inadequately represented. The mere fact that he failed to interview all the witnesses or any of the witnesses on the indictment does not necessarily mean he was neligent in the preparation of the case. It may well have been that he obtained information from other sources. Counsel stated that he did. There is no reason to disbelieve him.

The complaint that Mr. Brown failed to interview a single witness endorsed by the State does not appear

to have prevented the defendant from obtaining a fair trial.

The Missouri Supreme Court relied upon this conclusion in affirming the lower court's rejection of McQueen's claims, stating:

In this case, the defense was self-defense. The defendant was the only eyewitness available to sustain that defense. Therefore, consultation with the defendant in this case was basically what was required in order to make proper and adequate presentation of the defense. [475 S.W.2d at 114.]

This theme was reiterated in the federal district court's opinion disposing of McQueen's § 2254 petition. The district court noted that, since a "full and fair hearing" had been conducted in state court, further hearing was unnecessary, and it held as follows on the merits:

Petitioner's main attack on the effectiveness of his trial counsel is made by way of his assertion of inadequate trial preparation. The Missouri 27.26 court found that defense counsel expended a substantial amount of effort in preparing for trial on the St. Louis murder charge, and that this trial preparation began well in advance of counsel's formal appointment. Counsel had spoken at length with the only eyewitness to the killing—petitioner himself. Counsel's failure to interview prosecution witnesses, although an admittedly normal practice for him, and his failure to visit the scene of the crime were, nevertheless, the results of the exercise of his judgment. [357 F. Supp. at 562.][9]

■ From a complete examination of the record before us, we are forced to

---

9. Brown's failure to visit the scene of the shooting was not brought out in the 27.26 hearing, but it was noted both by the Missouri Supreme Court and by the federal district court that an examination of the trial transcript indicates that the attorney was quite unfamiliar with the layout of the deceased's apartment. For example, on cross-examination, Brown attempted to ascertain from the deceased's stepbrother in what bed Cole, the alleged lover of George Francis, slept. After the question was asked, the following interchange occurred:
A: To my knowledge, I wouldn't know because there were three beds up there.
Q: Three beds upstairs; is that right?
A: Yes.
Q: I see, I didn't know how big the upstairs was.

conclude that the district court's reliance on the state court's findings of fact is clearly erroneous and that petitioner has met his burden of proving a violation of his constitutional right to effective assistance of counsel. What remains is to remand the case to the district court to allow petitioner an opportunity to establish the existence of prejudice which would justify further relief.

■ Under Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), and the 1966 amendments to 28 U.S.C. § 2254 which effectively codified its holding, the district court must treat a state court finding of fact on a disputed issue as presumptively correct where a "full and fair hearing" has already been held and where the state court's finding of fact is "fairly supported by the record." 28 U.S.C. § 2254(d).

Regarding Brown's investigation of the St. Louis murder charge, the 27.26 court concluded that:

It may well have been that [Brown] obtained information from other sources. Counsel stated that he did. There is no reason to disbelieve him.

Based upon this record, the district court concluded that there was no inadequate trial preparation. The district court emphasized the fact that "[t]he Missouri 27.26 court found that defense counsel expended a substantial amount of effort in preparing for trial on the St. Louis murder charge." 357 F.Supp. at 562.

This crucial evidentiary conclusion, however, finds no basis whatsoever in the record at trial or at the 27.26 hearing. Brown testified at the 27.26 hearing that he conferred with the petitioner, but that he did not interview any of the 41 witnesses endorsed on the indictment—26 of whom testified at trial. Brown made no statement of any kind that could be interpreted to mean that he obtained information from other sources. Nor did his conduct of the trial itself suggest that he had obtained any information outside of that passed to him by the petitioner. Defense counsel called no witnesses other than petitioner; he introduced no documentary or physical evidence; and he submitted no outside information for impeachment or contradiction. We cannot therefore say that the state court's finding is "fairly supported by the record" or that the district court's reliance on it is justified. Indeed, the only factual conclusion that can be drawn from the 27.26 hearing is that attorney Brown's sole preparation for the defense of a client charged with first-degree murder was to interview the defendant himself. The question now to be resolved is whether that amounts to ineffective assistance of counsel within our precedents. In the circumstances of this case, we hold the lack of pretrial investigation amounts to ineffective assistance of counsel.

## IV.

■ Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), made it clear a decade ago that the right to counsel, guaranteed to federal defendants through the sixth amendment, is a fundamental right guaranteed to state defendants through the due process clause of the fourteenth amendment. Since the days of the "Scottsboro boys" rape case, Powell v. Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932), it has also been accepted that a state defendant has a right not only to the timely appointment of counsel but also to the assistance of counsel whose quality of performance does not fall below a minimum level of effectiveness. *See* McMann v. Richardson, 397 U.S. 759, 771, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970); Waltz, "Inadequacy of Trial Defense Representation as a Ground for Post-Conviction Relief in Criminal Cases," 59 Nw.U.L.Rev. 289 (1964). *See also* Reece v. Georgia, 350 U.S. 85, 76 S.Ct. 167, 100 L.Ed. 77 (1955); Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L. Ed. 680 (1942); Avery v. Alabama, 308 U.S. 444, 60 S.Ct. 321, 84 L.Ed. 377 (1940); Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938).

The Supreme Court, however, has never enunciated any clear standards for courts to follow in passing on claims of ineffective assistance of counsel. As a result, circuit courts, left without guidance, have groped for the correct prescription to apply. Over time, a generally accepted formula emerged and came to be known as the "mockery of justice" standard. Our circuit has earlier defined this standard in Cardarella v. United States, 375 F.2d 222 (8th Cir. 1967), in these words:

> [A] charge of inadequate representation can prevail "only if it can be said that what was or was not done by the defendant's attorney for his client made the proceedings a farce and a mockery of justice, shocking to the conscience of the Court." [375 F.2d at 230.]

More recently in Brown v. Swenson, 487 F.2d 1236 (8th Cir. 1973), we have had the occasion to express the same thought in other words. There we said:

> It is well established that in order to show a basis for relief on the ground of ineffective assistance of counsel the appellant must show actions of his lawyer which would constitute such conscious conduct as to render pretextual the attorney's legal obligation to fairly represent the appellant and circumstances which demonstrate that which amounts to a lawyer's deliberate abdication of his ethical duty to his client. [487 F.2d at 1240.]

■ Stringent as the "mockery of justice" standard may seem, we have never intended it to be used as a shibboleth to avoid a searching evaluation of possible constitutional violations; nor has it been so used in this circuit. It was not intended that the "mockery of justice" standard be taken literally, but rather that it be employed as an embodiment of the principle that a petitioner must shoulder a heavy burden in proving unfairness. *Cf.* Bruce v. United States, 126 U.S.App.D.C. 336, 379 F.2d 113, 116 (1967). Despite regular critical attacks on the "mockery of justice" standard by commentators,[10] we have adhered to it. We need not now resolve the issue of whether the right to effective assistance of counsel derives solely from the due process clause or also from the sixth amendment's "more stringent requirements." *See* Moore v. United States, 432 F.2d 730, 737 (3d Cir. 1970); United States v. Hammonds, 138 U.S.App.D.C. 166, 425 F.2d 597, 601 (1970); Bines, "Remedying Ineffective Representation in Criminal Cases: Departures from Habeas Corpus," 59 Va. L.Rev. 927, 936 (1973). Nor need we decide whether at this time to follow the

10. Attacks on this standard focus on what critics perceive as its ethical permissiveness which allows inexcusably sloppy lawyering to be passed unchallenged. One scholar of the subject has stated:

> It may be something of a puzzle to outsiders why lawyers, who demand so much of other professionals, ask so little of themselves. Doctors, after all, owe their patients much more than a mockery of medicine. But the mockery-of-justice standard does not really reflect the standard of performance which defense lawyers owe their clients. In theory defendants can bring malpractice actions against both doctors and lawyers, but as a practical matter the only remedy for inadequate representation has been to vacate otherwise valid convictions. As a result, the courts have been more concerned with the fairness of the proceedings taken as a whole than with the obligations of counsel. The mockery-of-justice standard simply reflects the view that the policy of finality in criminal cases so outweighs the consequences of inferior defense work that only the most serious errors and omissions by counsel deprive the defendant of a fair trial.

Bines, "Remedying Ineffective Representation in Criminal Cases: Departures from Habeas Corpus," 59 Va.L.Rev. 927, 928–29 (1973) (footnotes omitted). Other critics point to the essential vagueness of the standard which makes it "unpredictable and difficult to apply." Finer, "Ineffective Assistance of Counsel," 58 Cornell L.Rev. 1077, 1078 (1973). *See also* Grano, "The Right to Counsel: Collateral Issues Affecting Due Process," 54 Minn.L.Rev. 1175 (1970); Note, "Effective Assistance of Counsel for the Indigent Defendant," 78 Harv.L.Rev. 1434 (1965); Note, "Effective Assistance of Counsel," 49 Va.L.Rev. 1531 (1963).

trend set by the Third, Fourth, Fifth and District of Columbia Circuits and adopt a standard of "reasonably competent" representation. *See* McMann v. Richardson, *supra*, 397 U.S. at 770–771.[11]

We hold that, even under our existing precedents, the complained-of conduct amounts to ineffective assistance of counsel. Nevertheless, what these circuits have said in relation to the duty of investigation is here pertinent.

The Fifth Circuit long ago adopted a "reasonable counsel" standard, stating in MacKenna v. Ellis, 280 F.2d 592 (5th Cir. 1960):

> We interpret the right to counsel as the right to effective counsel. We interpret counsel to mean not errorless counsel, and not counsel judged ineffective by hindsight, but counsel reasonably likely to render *and rendering* reasonably effective assistance. [280 F.2d at 599 (emphasis in original).]

Relevantly, in King v. Beto, 429 F.2d 221 (5th Cir. 1970), this standard was applied to affirm the granting of a writ of habeas corpus in a state conviction where defense counsel never investigated the circumstances of the crime charged. *See also* Brooks v. State of Texas, 381 F.2d 619 (5th Cir. 1967).

The Fourth Circuit in Coles v. Peyton, 389 F.2d 224 (4th Cir. 1968), first broke new ground by overthrowing the older standard in favor of setting forth a series of specific requirements which defense counsel must observe in the representation of his client. Importantly, adequate investigation is a central requirement:

The principles may be simply stated: Counsel for an indigent defendant should be appointed promptly. Counsel should be afforded a reasonable opportunity to prepare to defend an accused. Counsel must confer with his client without undue delay and as often as necessary, to advise him of his rights and to elicit matters of defense or to ascertain that potential defenses are unavailable. Counsel must conduct appropriate investigations, both factual and legal, to determine if matters of defense can be developed, and to allow himself enough time for reflection and preparation for trial. [389 F.2d at 226 (footnotes omitted).]

The Third Circuit was the next to abandon the "mockery of justice" standard in Moore .v. United States, 432 F.2d 730 (3d Cir. 1970), but opted for a more generalized, "normal competency" standard rather than specific guidelines like those in Coles v. Peyton, *supra*. The court concluded that "the standard of adequacy of legal services as in other professions is the exercise of the customary skill and knowledge which normally prevails at the time and place." 432 F.2d at 736. But, in remanding the case for an evidentiary hearing, the court gave substance to the general rule by adding the following comment:

> We have no doubt that counsel acted in an effective manner as far as the trial judge was able to observe his conduct. But representation involves more than the courtroom conduct of the advocate. The exercise of the utmost skill during the trial is not

---

11. It was the phrase "reasonably competent advice" in *McMann* that appeared to trigger the Third Circuit's change of standard in Moore v. United States, 432 F.2d 730, 736 (3d Cir. 1970). The West Virginia Supreme Court has recently adopted the following test:

In the determination of a claim that an accused was prejudiced by ineffective assistance of counsel violative of Article III, Section 14 of the West Virginia Constitution and the Sixth Amendment to the United States Constitution, courts should measure and compare the questioned counsel's performance by whether he exhibited the normal and customary degree of skill possessed by attorneys who are reasonably knowledgeable of criminal law.

State v. Thomas, 203 S.E.2d 445, 461, (W. Va.Sup.Ct., filed Mar. 19, 1974). In reaching its conclusion, the *Thomas* court found Chief Justice Burger's arguments for a higher standard of competence among America's trial practitioners compelling. *See* Burger, "The Special Skills of Advocacy: Are Specialized Training & Certification of Advocates Essential to Our System of Justice?" 27 Fordham L.Rev. 227 (1973).

enough if counsel has neglected the necessary investigation and preparation of the case or failed to interview essential witnesses or to arrange for their attendance. [432 F.2d at 739 (footnotes omitted).]

Most recently in United States v. DeCoster, 487 F.2d 1197 (D.C.Cir. 1973), the District of Columbia Circuit abandoned its older standard and adopted detailed guidelines, similar to those of the Fourth Circuit, as a partial definition of the duties owed by counsel to his client under the following standard: "a defendant is entitled to the reasonably competent assistance of an attorney acting as his diligent conscientious advocate." 487 F.2d at 1202. The court drew specific attention to adequate investigation in guideline three:

(3) Counsel must conduct appropriate investigations, both factual and legal, to determine what matters of defense can be developed. The Supreme Court has noted that the adversary system requires that "all available defenses are raised" so that the government is put to its proof. This means that in most cases a defense attorney, or his agent, should interview not only his own witnesses but also those that the government intends to call, when they are accessible. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. And, of course, the duty to investigate also requires adequate legal research. [487 F.2d at 1204 (footnotes omitted).]

■ In deciding the instant case, the district court relied upon the sound precept enunciated in Robinson v. United States, 448 F.2d 1255, 1256 (8th Cir. 1971), that the exercise of a defense attorney's professional judgment should not be second-guessed by hindsight in a proceeding such as the present one. 357

F.Supp. at 563. Although we reaffirm this principle, we cannot agree that Brown's failure to do any more investigation of the case than the interviewing of the defendant comes within this rule. Brown's assertion that he never interviews prosecution witnesses is an absurd and dangerous policy which can only be viewed as an abdication—not an exercise —of his professional judgment. In this circuit, we have stated:

[T]he mere appointment of counsel, no matter how able, for a defendant charged with commission of a crime without opportunity to consult, advise or *to make such preparation for arraignment and trial as the facts of the case fairly demand* would be a travesty and would not satisfy the requirements of the Fifth and Sixth amendments. [Maye v. Pescor, 162 F.2d 641, 643 (8th Cir. 1947) (emphasis added).]

■■ We recognize that there is and should be a presumption that counsel is competent, which must be overcome by the petitioner in order for an ineffective assistance of counsel claim to lie. Crowe v. State of South Dakota, 484 F.2d 1359, 1361 (8th Cir. 1973). But here the requisite showing has been made. The highly respected American Bar Association Project on Standards for Criminal Justice, in its "Standards Relating to the Prosecution Function and the Defense Function" (Approved Draft, 1971),[12] has enunciated the duty to investigate in these terms:

It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to guilt and degree of guilt or penalty. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. The duty to investigate exists regardless

12. The A.B.A. Standards relating to defense counsel have been specifically incorporated into the guidelines for determining violations of the right to effective assistance of counsel laid down by the District of Columbia

Circuit in United States v. DeCoster, 487 F.2d 1197, 1203 (D.C.Cir. 1973), and by the Wisconsin Supreme Court in State v. Harper, 57 Wis.2d 543, 205 N.W.2d 1, 9 (1973).

of the accused's admissions or statements to the lawyer of facts constituting guilt or his stated desire to plead guilty. [A.B.A. Standards, *supra* § 4.1.]

The logic behind such a rule is obvious. As one district court succinctly put it in granting a writ of habeas corpus:

> The most able and competent lawyer in the world can not render effective assistance in the defense of his client if his lack of preparation for trial results in his failure to learn of readily available facts which might have afforded his client a legitimate justiciable defense. [Goodwin v. Swenson, 287 F.Supp. 166, 182–183 (W.D.Mo. 1968).]

And as another district court vividly stated in also granting a writ for failure to investigate:

> The lawyer who does not probe, does not inquire, and does not seek out all the facts relevant to his client's case is prepared to do little more than stand still at the time of trial. [Smotherman v. Beto, 276 F.Supp. 579, 588 (N.D.Tex.1967).]

In affirming the 27.26 court in this case, the Missouri Supreme Court commented that Brown's investigation was sufficient since "consultation with the defendant in this case was basically what was required in order to make a proper and adequate presentation of the defense." 475 S.W.2d at 114. The district court also accepted this premise. Yet it is precisely in such circumstances as these—where the only live eyewitness is the defendant—that outside investigation is absolutely crucial. In no other fashion can the truth of the defendant's version of events be corroborated.[13]

In Cross v. United States, 392 F.2d 360 (8th Cir. 1968), we dealt with a claim raised on direct appeal from a federal conviction that a defendant's retained counsel provided constitutionally inadequate representation at trial.[14] There, as here, defense counsel's trial technique was acceptable, but there, as here, defense counsel admittedly did not investigate the case beyond conversing with the defendant himself. Citing the statement in Glasser v. United States, 315 U.S. 60, 76, 62 S.Ct. 457, 467, 86 L. Ed. 680 (1942), that "[t]he right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial," we remanded the case to the district court to determine whether any prejudice resulted to Cross from the conduct of his attorney. We do so again here, and at the same time clarify what may have been unclear in *Cross*: that the failure to make a reasonable investigation may amount to ineffective assistance of counsel within the standards enunciated in Cardarella v. United

---

13. Any number of steps could have been taken by Brown to seek corroboration for McQueen's story. The possibility of a relationship between the deceased and Dr. Zoeller could have been explored as an explanation of the presence of Mary Zoeller's pistol in the deceased's apartment, for example. Other areas of important investigation have been suggested in Justice Seiler's dissent in the last Missouri Supreme Court case. McQueen v. State, 475 S.W.2d 111, 120–124 (Mo.1971).

14. Other circuits have found no distinction in the constitutional standard to be applied as between appointed and retained counsel. *See* United States v. Marshall, 488 F.2d 1169, 1192–1193 (9th Cir. 1973); West v. Louisiana, 478 F.2d 1026, 1032–1034 (5th Cir. 1973), rehearing en banc granted (Sept. 5, 1973); Goodwin v. Cardwell, 432 F.2d 521, 522 (6th Cir. 1970). Since Brown was appointed by the court, we do not here determine whether such a distinction should exist. We save too for another day the question, whether, in general, a different standard may be applicable as between a claim raised on direct appeal from a criminal conviction and one rasied in a collateral proceeding. *Compare* United States v. De-Coster, 487 F.2d 1197, 1201–1202 (D.C.Cir. 1973), *with* Bruce v. United States, 126 U. S.App.D.C. 336, 379 F.2d 113, 117 (1967).

States, *supra,* and Brown v. Swenson, *supra.*[15]

## V.

■■ Our inquiry as to whether or not to grant relief is not concluded by finding a constitutional violation in the failure of petitioner's attorney to make an adequate investigation of the case. Evaluation of a habeas corpus petition alleging ineffective assistance of counsel is a two-step process: first, determining, as we have already done, whether there has been a failure to perform some duty, as essential as the duty of investigation, owed by a defense attorney to his client; and second, determining, as will be done on remand, whether that failure prejudiced his defense. This second step is necessary, we believe, because the failure to investigate—though a constitutional error—might in certain circumstances be a "harmless" one and hence would not justify habeas corpus relief. We are guided in this regard by Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), where the Court fashioned its harmless-constitutional-error rule.

Although in *Chapman,* the Supreme Court cited the right to counsel enunciated in Gideon v. Wainwright, *supra,* as one of those "constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error," 386 U.S. at 23, we believe that there is an important and obvious difference between the total absence of counsel in *Gideon* and the ineffective assistance of counsel in the instant case. Since advice of counsel is so crucial to the exercise of a defendant's other rights, a total absence of counsel cannot but be harmful.

Yet where a defendant is represented by counsel and it is the effectiveness of his counsel's performance that has slipped below the acceptable standard, the seriousness of this constitutional violation must be judged in terms of the particular factual circumstances of that case.

■ It is a sensible view, as the Court pointed out in *Chapman,* that all trial errors which violate the Constitution do not automatically call for reversal. Applying that basic principle, the Court in *Chapman* went on to enunciate a harmless error rule "requiring the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." 386 U.S. at 24. Were that rule to be applied in ineffective assistance of counsel cases, it would appear that the state alone must bear the burden of proof. But such a conclusion need not necessarily follow.

As a constitutional error, ineffective assistance of counsel is *sui generis.* As we have explained above, it is not one of those fundamental errors like the absence of counsel in *Gideon* that can never be harmless. We add now that it is not the sort of error envisioned in *Chapman* which automatically puts a burden on the "beneficiary of the error either to prove that there was no injury or to suffer a reversal of his erroneously obtained judgment." 386 U.S. at 24. Unlike a constitutional violation actually caused by the state, such as an illegal search and seizure or a coerced confession,[16] ineffective assistance of counsel is a result of the volitional acts of one charged with representing the defendant. It is, in this sense, not a product of an adversary, but a flaw in the

---

15. In so holding, we re-emphasize the caveat expressed in Cross v. United States that courts will not allow a willful failure to investigate to be used as "an avenue by which counsel can upset the judicial processes." 392 F.2d at 367. Such a calculated dereliction of duty by an attorney will not avail his client and would subject the attorney to disciplinary proceedings by the court.

16. In *Chapman,* the Court applied its harmless error rule to the prosecutor's closing argument commenting at length upon the failure of the defendants to testify and to the judge's instructions permitting inferences of guilt to be drawn from the defendants' silence. The Court found those errors harmful. 386 U.S. at 26. Such comments were held constitutionally invalid in Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L. Ed.2d 106 (1965).

adversary process. To impose automatically the initial burden of proof on the state as described in *Chapman* would penalize the prosecution for acts over which it can have no control. In such circumstances, a more equitable sharing of the burden of proof seems appropriate.

The courts do not agree on which party must shoulder the initial burden of establishing prejudice, or conversely, the lack of prejudice, flowing from constitutionally inadequate representation. In Coles v. Peyton, *supra*, the Fourth Circuit held that a showing of counsel's omissions or failures amounting to ineffective assistance of counsel required the issuance of a writ of habeas corpus "unless the state, on which is cast the burden of proof * * * can establish lack of prejudice thereby." 389 F.2d at 226. Judge Craven in dissent argued that imperfections in trial representation did not justify shifting the burden of proof to the Government absent their categorization as "inherently prejudicial," 389 F.2d at 230, or "[w]here the facts are within the knowledge or reach of an adversary and not readily attainable by the other side * * *." 389 F.2d at 228.

The District of Columbia Circuit in United States v. DeCoster, *supra*, specifically adopted the majority view in Coles v. Peyton, and placed the burden on the Government, stating:

> Two factors justify this requirement. First, in our constitutionally prescribed adversary system the burden is on the government to prove guilt. A requirement that the defendant show prejudice, on the other hand, shifts the burden to him and makes him establish the likelihood of his innocence. It is no answer to say that the appellant has already had a trial in which the government was put to its proof because the heart of his complaint is that the absence of the effective assistance of counsel has deprived him of a full adversary trial.

> Second, proof of prejudice may well be absent from the record precisely because counsel has been ineffective. For example, when counsel fails to conduct an investigation, the record may not indicate which witnesses he could have called or defenses he could have raised. [487 F.2d at 1204 (footnote omitted).]

Judge MacKinnon, concurring and dissenting, accepted the majority's new test for adequacy of counsel, but emphasized that the burden of proving prejudice ought properly to be cast upon the defendant since "[s]uch proof is usually more within the ability of the accused, if such evidence exists at all * * *." 487 F.2d at 1205.

The Third Circuit in United States ex rel. Green v. Rundle, 434 F.2d 1112 (3d Cir. 1970), defined the test enunciated in Moore v. United States, 432 F.2d 730 (3d Cir. 1970), more fully and, in specifying that the burden generally rested on the defendant, expanded on the approach voiced by dissenting Judge Craven in Coles v. Peyton. The *Rundle* court said:

> In many instances ineffective assistance of counsel may have had so pervasive an effect on the process of guilt determination that it is impossible to determine accurately the presence or absence of prejudice. In other cases changes in circumstances since the original proceedings beyond petitioners' control, such as the death of a witness who was not called, may make it impossible at the time of the habeas corpus petition to determine prejudice. In such instances a finding of departure from the standard of normal competence requires without more, a new trial. In other cases the failure of counsel may be with respect to a narrow issue or area, and it may well be possible, in the habeas corpus proceeding, to determine whether or not the departure from normal competence was prejudicial. * * * When a habeas corpus petitioner alleges as a ground for relief the failure of counsel to exercise normal competence in

presenting specific trial evidence it is reasonable, we think, to put on petitioner the burden of showing that the missing evidence would be helpful. [434 F.2d at 1115.]

 We believe a flexible approach, similar to that in *Rundle*, is called for. We ought not to intervene in the criminal process unless and until it can be shown that the alleged error itself prejudiced the petitioner in obtaining a fair trial. But this is *not* to say that, on remand, petitioner must prove his innocence even by so much as a preponderance of the evidence; nor should we be understood to suggest that the Court may trespass upon what properly would have been the jury's province of weighing the truth or falsity of this evidence at the original trial. What we are saying is that, here, the petitioner must shoulder an initial burden of showing the existence of admissible evidence which could have been uncovered by reasonable investigation and which would have proved helpful to the defendant either on cross-examination or in his case-in-chief at the original trial. Once this showing is made, a new trial is warranted unless the court is able to declare a belief that the omission of such evidence was harmless beyond a reasonable doubt. *Cf.* Chapman v. California, *supra.*

In lieu of such a showing, we hasten to add, the defendant must be allowed to demonstrate that changed circumstances beyond petitioner's control have made it impossible to produce any helpful evidence at this time. The latter circumstances, if proved, would serve to shift to the state the burden of showing the absence of any prejudice in the trial because of the inadequacy of defendant's counsel.

This case will be remanded to the district court for a hearing on the issue of whether or not prejudice flowed from the failure of counsel to make a reasonable investigation of this case. The petitioner, as we have already stated, must shoulder the initial burden of showing either prejudice or, alternatively,

changed circumstances which would justify placing on the state the burden of proving the absence of prejudice.

The judgment of the trial court is reversed and the case remanded for further proceedings not inconsistent with this opinion.

Reversed and remanded.