Sanford THOMAS, Petitioner,

v.

Donald WYRICK, Warden, Respondent.

No. 74–539C(4).

United States District Court,
E. D. Missouri, E. D.

Aug. 6, 1975.

Jack M. Chasnoff, Clayton, Mo., for petitioner.

John C. Danforth, Atty. Gen. of Mo., Jefferson City, Mo., for respondent.

## OPINION

NANGLE, District Judge.

This is a petition brought by Sanford Thomas for a writ of habeas corpus under 28 U.S.C. § 2254. Respondent is the warden of the Missouri State Penitentiary where petitioner is presently serving a life sentence imposed by a jury in the Circuit Court of the City of St. Louis, Missouri. Petitioner's complaints herein arise out of the case for which he is presently incarcerated.

The grounds asserted by petitioner are the following:

1) that he was denied effective assistance of counsel (in the respects hereinafter set forth);

2) that he was denied due process of law because false statements were made by the prosecutor at defendant's original trial, such statements relating to the availability of an important witness; and

3) that petitioner's trial attorney had a conflict of interest in that he once represented the victim of the crime and the victim's wife and failed to advise petitioner of this relationship, which conflict thereby rendered such attorney unable to properly represent petitioner's interests.[1]

A history of the state court proceedings is necessary in order to fully understand the case. The petitioner was convicted of first degree murder in 1967 in a jury trial and sentenced to life in prison. He appealed and the Missouri Supreme Court affirmed the conviction. See *State v. Thomas,* 440 S.W.2d 467 (Mo.1969). In 1970, the peti-

tioner filed a motion to vacate the judgment and sentence under Missouri Supreme Court Rule 27.26. A hearing on this Rule 27.26 motion was held before Judge Waldo Mayfield, who had presided at the initial trial. Judge Mayfield denied petitioner's motion and petitioner appealed. On this appeal the Missouri Supreme Court held that the trial court failed to make proper findings of fact and conclusions of law, as required by Rule 27.26, and remanded the case for a new evidentiary hearing. See *Thomas v. State,* 465 S.W.2d 513 (Mo.1971).

A second evidentiary hearing was held, this time before a different judge, Judge P. F. Palumbo (Judge Mayfield having retired). After an evidentiary hearing the trial court denied relief and the petitioner appealed. In this appeal, the Missouri Supreme Court considered the evidence from the original trial and both Rule 27.26 hearings and denied relief to petitioner (Judge Seiler dissenting). See *Thomas v. State,* 512 S.W.2d 116 (Mo.1974). Thereafter, petitioner brought this action.

By agreement of the parties the record in this case includes the transcripts of the original trial and of the two Rule 27.26 evidentiary hearings. The Court has examined these transcripts and all records of the Rule 27.26 proceedings and finds that an adequate, complete and fair evidentiary hearing was afforded Thomas by Judge Palumbo. No further hearing is required in this Court by *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1936).

This Court finds, and respondent does not contest, that petitioner has exhausted his administrative remedies regarding the three above alleged grounds.

In the review of petitioner's appeal from his original conviction, Judge Seiler of the Missouri Supreme Court set out the facts which the jury could reasonably have found from the evidence. 440 S.W.2d at 468–469.

In its affirmance of the second circuit court Rule 27.26 decision denying petition-

---

1. Thomas' petition did not include this third ground but the parties have agreed that such contention may be determined in this case.

er's application, the Missouri Supreme Court also summarized the facts, 512 S.W.2d *at* 118 as follows:

> On Sunday evening, November 27, 1966, defendant had been riding around the North Florissant and Cass Avenue neighborhood in St. Louis with a number of other youths. About 8 p. m., they went to the the Greyhound Bus Station. At the station one Frederick Brown and defendant got into a taxicab, driven by John Dougherty, and the cab proceeded south on Broadway. One of the youths who had been with Brown and defendant at the bus terminal came back to where the others were parked and reported that Brown and defendant were going to 16th and Mullanphy. The others tried to follow the cab but lost it in the traffic and then drove to Brown's house. Sometime later, Dougherty was found in the front seat of his cab at 16th and Mullanphy unconscious. A tooth was knocked out and he was bleeding from two stab wounds in his chest, which wounds proved fatal.
>
> There was further testimony that Brown and defendant later went to Brown's house and entered the back door into the kitchen where the other boys were assembled, and that they threw a watch and wallet on the table and said "that was all they got, they robbed the cab driver". The watch and wallet were later identified as having belonged to Dougherty. One of the youths told his father something about what had occurred and his father reported the matter to the police. Brown was arrested the next day and pointed out to officers a garbage can in which they found portions of the partially burned wallet and pieces of charred paper that had been in it. The knife used in the murder was given to Niles Pursley by Brown's girl friend and was recovered by the police.
>
> Defendant, who apparently had no previous criminal record, was the only witness for the defense. He stated that after he and Brown entered the cab Brown whispered, "Let's rob the cab driver," but that he refused to go along with that plan and got out of the cab at 14th and Cass. He further stated that he later got another cab and went to 18th and Cass to see if Brown was at his mother-in-law's house; that about that time he saw Brown walking up the street so they both got into another cab and went to Brown's house, where they went inside. Defendant denied participating in the crime and denied that he and Brown walked into the kitchen and threw the watch and wallet on the table and said, "That's all we got out of the robbery."

The principle is clear that if there is sufficient evidence to sustain Judge Palumbo's findings, this Court must deny petitioner any relief. The district court must treat a state court finding of fact on a disputed issue as presumptively correct where a full and fair hearing has already been held and where the state court's finding of fact is fairly supported by the evidence. *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770; 28 U.S.C. § 2254(d).

As Judge Webster stated in *Winford v. Swenson,* 517 F.2d 1114 (8th Cir. 1975):

> These findings are entitled to a presumption of correctness with the burden on the habeas corpus petitioner to establish that such factual determinations were erroneous. 28 U.S.C. § 2254(d); *LaVallee v. Delle Rose,* 410 U.S. 690, 695, 93 S.Ct. 1203, 35 L.Ed.2d 637 (1973).

In order to determine whether petitioner has sustained his burden, this Court will consider in order petitioner's three contentions.

1) *Was petitioner denied effective assistance of counsel?*

*Wolfs v. Britton,* 509 F.2d 304 (8th Cir. 1975) and *McQueen v. Swenson,* 498 F.2d 207 (8th Cir. 1974) both hold that lack of pre-trial investigation can constitute ineffective assistance of counsel.

The precise standard to be used in order to ascertain whether the questioned legal representation "passes muster" in the Eighth Circuit is a bit unclear. In *Cardarella v. United States,* 375 F.2d 222 (8th Cir.

1967), *cert. den.,* 389 U.S. 882, 88 S.Ct. 129, 19 L.Ed.2d 176 (1967), the Court ruled that a charge of inadequate representation can prevail "only if it can be said that what was or was not done by defendant's attorney for his client made the proceedings a farce and a mockery of justice, shocking to the conscience of the Court". [citations omitted].

375 F.2d *at* 230.

This test was affirmed in *Crenshaw v. Wolff,* 504 F.2d 377 (8th Cir. 1974), but Senior Circuit Judge Matthes recognized a possible change in such standard when, *at* page 380, he stated:

The standard traditionally employed by this court to determine if counsel rendered ineffective assistance has been whether a "farce" or "mockery of justice" had occurred. More recently, several jurisdictions have worded the test for determining whether assistance of an attorney was constitutionally adequate in terms of whether the accused received "reasonably competent assistance of counsel." *See generally McQueen v. Swenson,* 498 F.2d 207 (8th Cir. 1974). Although this court in *McQueen* declined to rule whether the "mockery of justice" standard should be abandoned in favor of the standard more recently established in other jurisdictions, we find that the conduct of the assistant public defender in this case was fully adequate under either test.

Circuit Judge Ross, in *DeBerry v. Wolff,* 315 F.2d 1336, *at* 1340 (8th Cir. 1975), indicated that the "mockery of justice" standard was still being followed in the Eighth Circuit.

In the case of *Johnson v. United States,* 506 F.2d 640 (8th Cir. 1974), Chief Judge Gibson stated as follows:

While our prior cases such as *McQueen v. Swenson, supra; Garton v. Swenson, supra* [497 F.2d 1137] and *Robinson v. United States, supra* [448 F.2d 1255] speak of denial of effective assistance of counsel or ineffective representation, and similar phrases, it appears to us that characterizing counsel's conduct on the basis of effectiveness may suggest a standard not supported by constitutional principles. The term "effective," in its most general application, describes something which ultimately achieves a desired result. With reference to professional representation in criminal cases, that might be interpreted to mean achieving only outright acquittal of the defendant on the charges without regard to the weight and strength of the evidence adduced. A more appropriate nomenclature for the standard would be to test for the degree of competence prevailing among those licensed to practice before the bar. The standard would refer more precisely to the professional competence of one who has completed a long and arduous course of study for a professional license, and who has acquired some experience in applying legal principles and conducting court trials.

The professional standard could be said to include the responsibility to insure that the client is tried according to the applicable rules of evidence and practice and to urge such arguments on a client's behalf as are indicated by the evidence, or lack of evidence, adduced. It is not, however, constitutionally limited to an "effective" type of representation that would achieve acquittal of a defendant on any charge regardless of the facts. The constitutional provision includes neither "effective" nor "adequate" nor other adjectival terms in its guarantee of assistance of counsel. It merely states in plain language that "[i]n all criminal prosecutions, the accused shall enjoy the right to * * have the Assistance of Counsel for his defence." U.S.Const. Amend. VI. [footnotes omitted].

506 F.2d *at* 646.

At his trial petitioner was represented by Alfred I. Harris (now deceased), an attorney retained by petitioner's mother. Petitioner's bases for claiming ineffective counsel are that:

a) Harris failed to adequately prepare for trial in that he only conferred with petitioner once while petitioner was being

held pending trial, once while petitioner was undergoing a psychiatric examination and once just before the actual trial began. Further, petitioner's mother said she tried many times to speak with Harris but was unable to do so.

■ Harris' recollection was that he conferred with petitioner several times and was in frequent contact with his family. Further, petitioner has failed to show how additional conferences would have helped his defense. Petitioner and his mother had told Harris all they knew. It is likely that more frequent meetings may have benefited petitioner's morale but that is hardly a factor to consider in this action. Judge Palumbo found that Harris had sufficient contact with petitioner and his family to prepare for trial and concluded that "ineffectiveness of counsel is not established merely by the absence of frequent conferences with the petitioner". It is the finding of this Court that such finding and conclusion are supported by the evidence presented at the Rule 27.26 hearing.

b) Harris admittedly failed to interview possible witnesses in preparation for his case.[2]

Petitioner testified he gave Harris the names of several possible witnesses in his behalf, i. e. the people at the house of the grandmother of one Frederick Brown (also involved in the crime). None of these persons testified at either Rule 27.26 hearing. Petitioner indicated that they might be helpful in supporting a defense of alibi.

Petitioner has not made clear whether he identified for Harris (or tried to) the other youths with him the fateful evening of November 27, 1966. Two of them testified as state's witnesses at the trial (Pursley and Anderson). However, the state listed sixteen persons as prospective witnesses at the initial trial and Harris concededly had knowledge of other witnesses who were expected to testify for the state. Harris admitted that he did not interview any of these witnesses. Concerning the state's

witnesses, Harris indicated he wanted to avoid any charge of tampering. A review of his cross-examination of key state witnesses shows that Harris made a point of establishing that he had never before spoken with the witnesses.

In some respects these facts relating to pre-trial interviews of witnesses are similar to those in McQueen, supra. Concededly in neither case did counsel interview any witness. In the case at hand, although there was only one admitted eye witness (Brown, whose statement fully implicated petitioner), this witness was not contacted in any fashion.

The Court of Appeals said in McQueen, at 216, that "the exercise of a defense attorney's professional judgment should not be second-guessed by hindsight", but the Court went on to point out that failure to interview prosecution witnesses under the circumstances of the case before it constituted an abdication of the attorneys' professional judgment.

■ This Court believes the applicable rule defining the parameters of the Sixth Amendment right to assistance of counsel is in this Circuit the "farce" or "mockery of justice" rule announced in Cardarella. The Court concludes that all of petitioner's contentions, singularly or jointly, do not constitute inadequate representation under this criterion. This is, undeniably, a close case. If the applicable rule were the one adverted to by Judge Matthes in Crenshaw, supra, i. e. "reasonably competent assistance of counsel", I believe petitioner would not have been afforded his constitutional right to assistance of counsel.

Regardless of the standard by which Thomas' counsel should be measured, I do not believe that any failing of his counsel prejudiced him. See McQueen, supra.

■ The importance of Brown's relatives as "alibi" witnesses is not clearly established. In his trial, petitioner testified he got out of the cab, leaving Brown alone

---

**2.** These witnesses fall into three groups: 1) those at Brown's grandmother's when Thomas stopped by, 2) the other young men with Brown and Thomas the evening in question, and 3) Frederick Brown.

with the driver. He walked a bit and caught another cab and went to Brown's mother-in-law's house where she, Brown's wife and Brown's wife's cousin were present (TR. 218). Thomas said he stayed there "just long enough to ask . . . had he been there" ("he" meaning Brown) (TR. 218). Thomas called a cab from there and it was outside blowing its horn as he left the house. As petitioner came out, Brown was walking up the street and they both got into the cab and went to Brown's house (TR. 220). It is conceivable that these three persons might have supported petitioner's claim of "alibi". They perhaps were the persons petitioner referred to when he said he tried to give names to Harris in his first conference (TR. 118).

Judge Palumbo found that their testimony would have been of questionable value. The petitioner's own testimony at his trial indicates that he was not in their presence very long. Further, petitioner did not offer them as witnesses in either Rule 27.26 proceeding nor has he made any effort to indicate that their testimony would have supported his "alibi". The petitioner's actions after he said he left Dougherty's cab, the vagueness concerning the exact time, the lack of any evidence that Brown's relatives saw Brown come up as petitioner left their presence, all support Judge Palumbo's conclusion that the testimony of these witnesses would have been of questionable value. In view of Brown's change of heart and his testimony, it would seem fair to assume that petitioner would have produced Brown's relatives at his Rule 27.26 hearings *if* they would have been helpful to his cause.

This Court finds, concerning the witnesses at the house of Brown's mother-in-law, that petitioner has failed in his burden to show that their testimony would have proved helpful to the defense.

Concerning the number of companions who were with petitioner during the time he entered the cab with Brown and when he arrived at Brown's house later, it seems to be an exercise of hindsight to now state that failure to interview them prejudiced petitioner's case. Nothing is claimed to have occurred before petitioner entered the cab with Brown which would be exculpatory or helpful to petitioner. In other words, there was no factual disagreement of any events up to the time petitioner entered the cab with Brown.

Between the time petitioner and Brown entered the cab and the time they met again later outside of Brown's house, according to petitioner, none of these "companions" was with petitioner. The petitioner's version of what happened at Brown's house has only two variances from the prosecution's version: 1) Lonnie Anderson testified that he had told a police officer that Brown said when he entered the apartment "we stuck up a cab driver", then laughed and said "yeah, I stabbed him"; and 2) Niles Pursley testified that when Brown and petitioner came in "they threw a watch and wallet on the table and said . . . they robbed the cab driver". On cross-examination Pursley stated he did not know which of them made this statement.

At his trial, petitioner denied that these statements were made in his presence and testified that he and Brown were going up the stairs to Brown's house when the others came up (TR. 220).

It appears that petitioner, Brown, and four others (Jessie Stewart, "Boonie" or "Buds", Dennis Wright, and Johnny Wright), were present at Brown's house at this time. Stewart, "Boonie" or either of the Wrights conceivably could have supported petitioner's defense, although they may have been difficult to locate. At his trial, petitioner denied knowing where any of these four young men were. Thus, at least at the time of trial petitioner would have been unable to locate any of them. There was no evidence at either Rule 27.26 hearing, and none has been suggested in this proceeding, to indicate that even if found these young men would have supported petitioner's case. Two of their friends testified against petitioner in his trial. This Court finds that petitioner has failed to show that the failure to interview these young men (*assuming* that his attor-

ney would have been able to locate them) prejudiced him in obtaining a fair trial.

Another possible witness must be discussed at this point, Frederick Brown. By the time petitioner came to trial Brown had confessed to robbing and stabbing the cab driver and had fully implicated petitioner in this crime. Brown had pled guilty and was serving two life sentences in the Missouri State Penitentiary in Jefferson City, Missouri. Harris had made no effort to interview Brown before the trial, by deposition or otherwise. After petitioner had been sentenced to the State Penitentiary and had been there for some months, Brown prepared an affidavit stating that petitioner had *not* been involved in the crime but that two others were. This affidavit was prepared about one year after petitioner's trial. Brown also testified to this effect at the Rule 27.26 hearings.

Harris conferred a number of times with the prosecutor's office. Judge Palumbo found that Harris had seen the state's files and knew what its witnesses could say and questioned whether additional interviews would have been helpful. He found that the witnesses whose names petitioner gave to Harris would have been of no value to petitioner's defense. Judge Palumbo further found that Harris was an experienced criminal trial attorney and that he competently tried petitioner's case.

Judge Palumbo found that Brown's testimony in the hearings completely lacked credibility. The record clearly shows that Brown himself testified that he fully intended to keep petitioner involved as a participant in the crime until certain of his plans fell through. Then he had a change of heart and, on November 3, 1969, prepared an affidavit completely changing his story and stating that petitioner had nothing to do with the robbery and killing.

Brown's "change of heart" occurred after certain events took place and this Court agrees with the finding of Judge Palumbo that Brown was not a credible witness and that, even if Harris had interviewed Brown before petitioner's trial, Brown would not have been any help in the defense of peti-

tioner. There is more than ample evidence in the record to support Judge Palumbo's finding that the failure to interview and call Brown was based upon a choice of trial tactics. This Court so finds.

This is not mere speculation as a careful reading of Brown's testimony at the Rule 27.26 hearings will show. Brown clearly did not exonerate petitioner until his own hopes for help from the others he belatedly involved had completely caved in. This change of heart occurred months after petitioner's trial. Although Brown indicated at the Rule 27.26 hearings that he would have testified on behalf of petitioner if he had been called at petitioner's trial, this belated effort is so contradicted by Brown's other testimony, his confession, and his actions as to be totally unbelievable and this Court so finds.

Under all the evidence, this Court finds that petitioner has failed to sustain his burden under *McQueen* of showing that there existed admissible evidence from witnesses "which could have been uncovered by reasonable investigation and which would have proved helpful to the defendant . . . at the original trial".

c) Harris failed to advise petitioner of his constitutional right to remain silent and not testify.

■ Judge Palumbo found that Harris did advise petitioner of his right to remain silent. The testimony of Harris clearly supports this finding. Harris recommended that petitioner testify since he appeared articulate, intelligent and had no prior record. This Court fully agrees with Judge Palumbo's finding (and with Harris' advice). Under the circumstances of the case, it is hard to conceive of the petitioner not testifying in his own behalf and petitioner's complaint on this point is totally misplaced.

2) *Was petitioner denied due process because of the prosecution's erroneous statement that Frederick Brown was unavailable as a witness?*

■ Apparently due to a mistake in names (or for some other reason), the attor-

ney prosecuting the case against defendant erroneously advised defendant's attorney that Frederick Brown, who was then in the penitentiary, had hepatitis and could not appear in court. Actually, Brown had been endorsed as a state witness but the prosecutor was allowed to withdraw this over Harris' objection.[3] A long discussion took place at the trial between the Court and the attorneys. During the discussion Harris indicated that he wanted the state to call Brown because Brown's testimony might help the defendant. However, he refused to attempt to have Brown brought in and made no reference to the hepatitis issue as being a consideration. It is clear to anyone familiar with trial tactics that Harris' comments regarding Brown's testimony were purely tactical and made in behalf of the defendant. As he testified in both Rule 27.26 hearings, being aware that Brown's confession fully implicated petitioner in the crime, Harris would not have called Brown even if he had been available. Thus, the prosecutor's false statement regarding Brown's availability of itself had no effect on Brown being called by petitioner or on petitioner's defense, unless we speculate that Harris, by conferring with Brown prior to trial or by pre-trial deposition, could have secured information or prospective testimony favorable to petitioner. Hence, the question here really falls into the previously treated question of pre-trial interview of witnesses (including Brown) covered earlier in this opinion. We have previously found that a pre-trial interview with Brown would have been fruitless under Brown's own testimony.

This Court holds that Judge Palumbo's finding that petitioner was not prejudiced by the prosecutor's erroneous statement is supported by the evidence. This Court further finds that the petitioner was not thereby deprived of due process of law.

3) *Did the relationship between petitioner's attorney and the victim (and his wife) violate any constitutional or other rights of petitioner?*

■ Mr. Harris had once represented the wife of Dougherty, the cab driver, who was robbed and killed in the crime for which petitioner was found guilty by a jury. Petitioner claims this constituted a conflict of interest which adversely affected Harris' representation of petitioner. Harris thought he had advised petitioner and his family of this acquaintanceship with the Dougherty family. In any event, Mrs. Dougherty was a minor witness, not at all important to any major issue. There is no evidence to indicate that Harris omitted any questions of her which an attorney would have asked had he not known her. Nor is there any evidence that Harris was in any way affected by his acquaintanceship with the Doughertys. Petitioner's case was in no way affected by Harris' relationship with the Doughertys. Judge Palumbo found no conflict or adverse effect on petitioner's case because of this relationship and this Court so finds. *Cf., United States v. Valenzuela,* 521 F.2d 414 (8th Cir. 1975).

For the foregoing reasons, this Court holds that petitioner was not denied a fair trial. In his claim of ineffective counsel, petitioner has failed to show resultant prejudice. The false information regarding Brown's unavailability did not constitute a failure to provide petitioner with due process. Lastly, the relationship between petitioner's attorney and the Doughertys was of no significance in any respect and had no bearing on petitioner's trial.

For these reasons the petition will be denied.

---

**3.** It is interesting to note that during Harris' direct examination of petitioner, the prosecution objected to petitioner's giving his reason for getting out of the cab (that Brown whispered to him "let's rob the cab driver") on the grounds that Brown was not available to refute the statement and this objection was sustained (TR. 215–217). However, by Harris' persistence, the point was clearly made before the jury.