**UNITED STATES of America ex rel. Norman THOMAS, Petitioner,**

v.

**Hon. John ZELKER, Warden, Green Haven State Prison, Stormville, New York, Respondent.**

No. 70 Civ. 3323.

United States District Court, S. D. New York.

June 22, 1971.

As amended July 28 and Nov. 22, 1971.

Melvin D. Kraft, New York City, for petitioner.

Louis J. Lefkowitz, Atty. Gen., of the State of New York, for respondent; Hillel Hoffman, Asst. Atty. Gen., of counsel.

OPINION

FRANKEL, District Judge.

Convicted after a one-day bench trial on May 6, petitioner was sentenced on July 10, 1968, to concurrent terms of 6 to 18 years for robbery and 5 to 15 years for attempted rape. In his *pro se* petition for habeas corpus, he made a number of seemingly footless contentions plus a more plausible assertion that his state representation by Legal Aid counsel had been below the modest minimum the Federal Constitution has been held to guarantee. The latter charge appeared sufficient to warrant the assignment of counsel here for its fuller airing. The assignment was accepted by Melvin D. Kraft, Esq., who has been devotedly effective by the highest standards. Petitioner's claims have been organized, explicated and explored in an evidentiary hearing. For reasons unknown to the state trial court and unknowable anywhere without the efforts made here on his behalf, it is now evident that peti-

tioner's "purported representation by counsel was such as to make the trial a farce and a mockery of justice * * *." United States v. Wight, 176 F.2d 376, 379 (2d Cir. 1949). Accordingly, his petition will be granted and he will be set free unless the State is able at this late date to proceed swiftly to a retrial.

## I.

At about 4:00 a. m. on October 18, 1967, petitioner was seized by two policemen on the roof of a Bronx apartment building where, according to the evidence against him, he was attempting to rape a woman he had just robbed. As this court has observed in an earlier opinion appointing counsel, the scene thus recounted was a damning one for the petitioner. Nevertheless, it is not disputed that the conflict between the testimony of the alleged victim and that of petitioner, who took the stand to defend himself, was sharp and crucial. The prosecutrix, a lady of 50 or so, possessed of a criminal record and possibly vulnerable in other respects in her accusatory role, told of having stopped for a drink at a place called the Home Cafe following a spat with her "boyfriend" who had driven her home from her night-shift job as a restaurant cashier. According to her testimony, she left the cafe shortly before 4:00 a. m.; walked to her nearby apartment building; rang for the elevator; and was then accosted by petitioner, whom she had never seen before and who came "springing * * * out of nowheres." She testified that petitioner demanded her money; she gave him a $20 bill, which was all she had; and then, with him holding an open knife to her throat, she went as his prisoner to the roof, where the attempted rape and arrest ensued in the succeeding minutes.

Petitioner's story, which needs telling only in equally broad terms for our purposes, was that he had cashed his wife's relief check (his wife being in the hospital at the time) earlier in the day, accounting for the $20 bill; that he had known the alleged victim for about two years; that he was in Archer's Bar[1] (not the Home Cafe) at 3:30 a. m. making a telephone call to his sister, and saw the complainant there at the time; that she followed him out when he left and offered him her favors for a $10 fee. Then, he testified, she had taken his $20 bill, promising to change it, and, with him following some distance behind under her instructions, disappeared around a corner, seemingly in process of defrauding him. It was after that, he said, that he caught up with her in the building lobby, where he "grabbed her by the arm and * * * asked her was she trying to be slick." Skipping other details, petitioner told that, although he had taken his money back, the complainant's renewed invitation and her report of her sister's being in her apartment with company led to the rooftop scene in which he was soon discovered. But he denied that he was about to have intercourse when the police arrived.

It appears that petitioner was brought before a judge in the Bronx on the morning of his arrest, that he denied any wrongdoing at that time, but that there was no hearing on probable cause then or thereafter. It also appears that he was assigned Legal Aid counsel and that an attorney named Richter, whom he never saw again, spoke to him hurriedly on that occasion. Petitioner was remanded then, and has been locked up ever since.

From the morning of October 18 until December 15, no lawyer came to speak to petitioner about his plight. He was indicted on November 1, and was in court to enter his plea of not guilty on that day. Thereafter, he came to court several times to hear that his case was being postponed, evidently "represented" for these purposes by a series of Legal Aid attorneys, but never having an opportunity to consult with any of them.

At some time in the month of November, a young Legal Aid lawyer named

---

1. The Bar is spelled as "Archie's" in the trial record, but the knowledgeable witnesses at our hearing supplied the spelling used herein.

Robert Phillips was assigned by the agency to take charge of petitioner's case. On or just before November 30, Phillips obtained from petitioner's wife information for a bail-reduction application, which was "successful" in that the amount was lowered, but not enough to bring about petitioner's release.

On December 15, 1967, petitioner had his first and only conference with Phillips. They talked for about a half-hour. In addition to protesting his innocence, petitioner gave Phillips a list of prospective witnesses and an account of how he thought each could help vindicate him:

(1) Olen Jones, night bartender at Archer's Bar, who would tell of seeing both petitioner and the prosecutrix there on the early morning in question.

(2) Victor Goldstein, a neighborhood friend, who would tell of having introduced petitioner to the prosecutrix well before the time of the alleged crimes.

(3) David Blecher, owner of a check cashing agency, who would corroborate the story that petitioner had cashed his wife's check on October 17, 1967, arguably accounting for the $20 bill found on him and demonstrating that there was no motive for robbery.

(4) Mrs. Dorothy Alexander, petitioner's sister, who would testify that he had called her on the early morning of October 18, saying he was at Archer's Bar and was coming over to see her—a course of conduct familiar in their fraternal relationship.

(5) Miss Carol Holloway, who would say petitioner had retained her as a babysitter on the night of October 17, 1967, paying her $10, and thus, arguably, adding to the evidence that he had cashed a check and had neither robbed the complainant nor had reason to do so.

Because he was in the midst of another pressing case when he met petitioner and was moved from the Bronx Legal Aid office immediately after the trial of that other case ending in early January of 1968, Mr. Phillips never had an opportunity to pursue these leads or work further on any other aspect of petitioner's defense. Nobody told petitioner about the transfer of Phillips, and he was to hear nothing about the state of his representation until March 11, 1968. On February 26, 1968, having sat in jail for over four months with no clear word of what was happening to him, petitioner addressed to the court a pro se "Application for Writ of Habeas Corpus" alleging, *inter alia*, a failure to prosecute. This application (interpreted as "a motion to dismiss the indictment on the grounds of a denial of the right to a speedy trial") was denied. On March 11, 1968, a Legal Aid attorney whose name we do not know handled a calendar call of petitioner's case and told him that a new staff attorney, William Harrison, had been assigned to defend him. According to the pertinent court record, petitioner's case was marked "ready" for trial at the time of that March 11 call, but neither Mr. Harrison nor anyone else even supposedly knowledgeable was present to handle the matter, and another of many adjournments was ordered.

Still unaware of what, if anything, was being done for him petitioner drafted a paper to move for relief of the Legal Aid Society and assignment of different counsel. He wrote: "I have been locked up for five months and each time I come back to court I have another lawyer handling my case." At the cursory oral hearing of his motion on March 22, 1968, asked why he was dissatisfied, petitioner said: "It seems to me that they are not interested at all." A Legal Aid attorney was present and stated that Mr. Harrison had been assigned to petitioner's case. Judge Brust then adjourned the motion.

On March 25, 1968, Mr. Harrison appeared before Judge Brust with the pe-

titioner and gave this account of the situation:

"I have just been assigned to this case and would like an adjournment for two or three weeks to enable us to discuss the case at length with the defendant."

Judge Brust entered an order dated March 25, 1968, denying petitioner's motion. On March 26, 1968, the petitioner was visited by Mr. Harrison, who was destined to conduct his defense at trial. Petitioner reviewed again the list of his alleged witnesses. Harrison made it clear that nothing had been done thus far to investigate or prepare the case for petitioner's defense. The interview lasted about 30 minutes. The two never talked together again until May 6, the day on which petitioner was tried and convicted.[2]

In the intervening weeks, petitioner had no contact with anyone purporting to. help with, or even keep him informed about, his case. Out of this total isolation he addressed to the court another handwritten motion, dated April 19, 1968, praying that Legal Aid be relieved and that an attorney from a panel of lawyers available for such assignments be substituted. Mr. Harrison knew of this motion. He neither responded nor reacted to it in any significant way. The motion came on to be heard May 1. Harrison was not there. Noting the prior denial by Judge Brust, Judge Bloustein denied the motion. After the Judge announced that ruling, the *prosecutor* volunteered:

"This case was put in the trial part yesterday. Mr. Bill Harrison of the Legal Aid Society I know personally spoke to this defendant I would say close to an hour while—"

The prosecutor was cut off at that point by the Judge's inquiry as to the readiness of the case for trial. This was probably just as well. If the prosecutor knew what he was talking about at all, he could only have been referring to the March 26 interview, some five weeks earlier, not any conversation between Harrison and petitioner "yesterday," as the context seemed to suggest. The best that can be said for what the representative of the People offered is that it was a gratuitous irrelevancy. Nobody then— and no state officer ever—undertook to appraise accurately the claim of petitioner that his supposed representation by counsel was a nightmarish burlesque.

The case was set for May 6. Petitioner's trial counsel, Harrison, never met with any of the people petitioner proposed as witnesses. In the event, only petitioner testified for the defense. Yet the record of our proceeding, so much later, has developed the following:

(1) An investigator for Legal Aid spoke to Victor Goldstein by telephone. Goldstein said the complaining witness was a "slut," but, according to the investigator, could not recall being present when she and petitioner talked to each other.[3] With this intelligence before him, having a client who claimed the role of potential customer rather than attempted rapist, Harrison never saw fit to see Goldstein himself, or even to have anyone interview him in person.

(2) Olen Jones, the bartender at Archer's Bar, would have testified (and swore at our hearing) in support of petitioner's account— that the complainant was at the

---

2. The case had been set for trial on April 10. Petitioner was pressing for an early trial. Harrison did not appear on April 10. Nobody ever told petitioner where he was or why he was absent. The case was put over, of course.

3. Although he was apparently available at the time of Thomas's trial, Goldstein could not be found for our hearing. This aspect of the reconstruction comes from Harrison himself and from the investigator's report in the Legal Aid file on Thomas's case.

bar on the critical morning, that she left after petitioner, that she was a heavy drinker. Jones was readily accessible at all material times. Harrison never spoke to him; nobody from Legal Aid spoke to him, even by telephone.[4]

(3) David Blecher, subpoenaed to appear at our hearing, swore credibly to the cashing of the check for petitioner following Mrs. Thomas's telephoned instructions from the hospital, just as petitioner had described at trial. On November 17, 1967, at Mrs. Thomas's request, he had written a letter stating these facts which is in the Legal Aid file. Harrison reported vague, abortive efforts to have Blecher as a witness, including a telephone call during a recess on the day of the trial. Blecher testified that he "was never asked * * * to testify or do anything like that" and was, in fact, never contacted by anyone from the Legal Aid Society. The court credits the latter account.[5]

## II.

Upon the foregoing facts, assigned counsel here argues two interrelated points: (1) that the right to effective assistance of counsel was denied when petitioner's requests to have different counsel assigned were rejected by courts which neither had nor adequately sought an understanding of petitioner's plight while he awaited trial, and (2) that the representation petitioner ultimately had was, in any event, so woefully inadequate that his conviction cannot stand. The first branch of the argument supplies a reminder useful to all of us who sit in criminal trial courts. It is sufficient, however, to hold, upon all the facts now disclosed, that petitioner's trial mocked justice because of the total failure of his assigned lawyer to investigate and prepare the available materials for the defense.

It is familiar law "that the right to counsel is the right to the effective assistance of counsel." Rastrom v. Robbins, 319 F.Supp. 1090, 1092 (D.Me. 1970) (Gignoux, J.), citing cases. Here, for whatever reasons of calendar pressure and understaffing, Legal Aid counsel left petitioner to the most brutal and horrifying kind of isolation, effectively walled off for months from any genuine assistance by a façade of "representation." Those supposedly aiding him failed even to see him. He did not know who his lawyer, as a live human being, was supposed to be. When his putative lawyer was replaced nobody told him about it. Twice, he supplied lists of witnesses. He was never told what, if anything, was being done about them. To put the matter more precisely, he was never told that nothing was being done to pursue the elementary and obvious things required for even a rudimentary defense.

While the constitutional "test" is not routinely formulated in such terms, any lawyer or judge might usefully wonder how he would react to having legal "as-

---

4. Upon the record of our habeas hearing, respondent argues that Olen Jones is not to be believed. The court did find its credulity somewhat strained by at least some aspects of his testimony. But that is of little or no consequence now. Jones was obviously prepared in 1968, and even in 1971, to swear to facts helpful to petitioner. He should have been called, or at least considered, as a witness. A jury then, or a trial judge, might well have believed him—or at least found enough in what he said, when considered with other things defense counsel neglected, to generate a reasonable doubt. The failure even to meet with Jones cannot now be cured or ruled immaterial on the asserted ground (unknown then, of course) that Jones might have seemed less than completely credible to some listeners.

5. Petitioner's sister confirmed her part of his story at our hearing. The alleged babysitter could not be located.

sistance" of the kind this petitioner received. Imagining such a thing, we would not want to omit the court appearances at which the petitioner sought different counsel, available from a state panel, and heard his request abruptly denied without sufficient inquiry into how the defense was being conducted.

One of the more familiar causes of ineffective assistance is the appointment of counsel too late for adequate investigation, including, of course, the discovery and interviewing of possibly helpful witnesses. E. g., Twiford v. Peyton, 372 F.2d 670 (4th Cir. 1967). But timely appointment becomes a cruel joke when the defendant officially has a lawyer, but is actually being ignored. Even where the accused has had retained counsel, the failure to interview witnesses "whose testimony may or may not have been favorable" has been a central factor among those showing that the adequacy of the representation fell below the constitutional minimum. King v. Beto, 429 F.2d 221, 224 (5th Cir. 1970); see also United States ex rel. Williams v. Follette, 408 F.2d 658, 660 (2d Cir. 1969), rev'd on other grounds sub nom. McMann v. Richardson, 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970); Pennington v. Beto, 437 F.2d 1281, 1285 n. 2 (5th Cir. 1971).

Of course "[t]he constitutional requirement of the effective assistance of counsel does not require that subsequent examination disclose that every conceivable avenue of evidence has been totally explored and every possible theory of defense has been pursued to judgment." United States ex rel. Boucher v. Reincke, 341 F.2d 977, 981 (2d Cir. 1965). But a first-year law student would pursue leads concerning doubts about the innocence of an alleged rape victim. Petitioner's ostensible lawyer dropped the subject when an investigator reported that Victor Goldstein might be useful for this purpose, but not necessarily on everything else. This court does not sit to second-guess the informed judgments of responsible attorneys. It would be an insufficient basis for relief if "hindsight" simply revealed "tactical or strategic errors 'over which conscientious attorneys might differ'." United States ex rel. Maselli v. Reincke, 383 F.2d 129, 132 (2d Cir. 1967); United States v. Silva, 418 F.2d 328 (2d Cir. 1969); United States v. Garguilo, 324 F.2d 795, 797 (2d Cir. 1963); United States ex rel. Fazio v. Fay, 348 F.2d 418, 420 (2d Cir. 1965); cf. United States ex rel. Boucher v. Reincke, 341 F.2d 977, 981–982 (2d Cir. 1965). Respondent urges that the decision not to call Victor Goldstein was within the area of such irreversible judgments, and Mr. Harrison himself stated on the witness stand: "I was satisfied to the extent that had I called Mr. Goldstein that he would not have been a cooperative witness, would not have enhanced the defendant's case." This asserted judgment, on the facts before Harrison at the time, is indefensible and outside "the range of competence demanded of attorneys in criminal cases." McMann v. Richardson, 397 U.S. 759, 771, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970). Mr. Harrison had taken no steps sufficient to be professionally "satisfied" of anything. He had simply neglected to do the rudiments of his job. Correctly described, his "decision" was no decision at all. The investigation was so perfunctory that nothing approaching an informed tactical choice could be made responsibly, and none was in fact made.

Other witnesses, patently favorable and readily accessible even years later, were neglected altogether. As to one (Blecher), Legal Aid counsel stirred up a vague, unreliable memory of having called him during a recess in the one-day trial and having received an unencouraging response. This court rejects as incredible that claimed effort—half-hearted, listless and insufficient as it would have been—and finds that Blecher was not called, and that he could and should have been, but was not, prepared and summoned for the trial.

The grim picture seems clear enough. From first to last—from the failure to

confer adequately with petitioner, through the pattern of insufficient inquiry in the state courts blocking petitioner's efforts to obtain decent legal assistance, to the total failure to do any of the work appropriate for the defense in the circumstances of this case—petitioner's so-called representation at his trial was such as to "shock the conscience of the Court and make the proceedings a farce and mockery of justice." United States v. Wight, 176 F.2d 376, 379 (2d Cir. 1949), cert. denied, 338 U.S. 950, 70 S.Ct. 478, 94 L.Ed. 586 (1950); and see cases collected in United States ex rel. Scott v. Mancusi, 429 F.2d 104, 109 (2d Cir. 1970).

Respondent is correct in asserting that the state trial record, as it stands, is powerful proof of petitioner's guilt. But the infection now discovered strikes at the heart of that record. We cannot assume that if the case had been conscientiously prepared and faithfully presented the judge or jury [6] would in the end have believed the account given by the complainant and the police. This court must, therefore, reject the suggestion that an infirmity so basic as the one now shown may be passed over as harmless error. Compare Chambers v. Maroney, 399 U.S. 42, 53–54, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970).[7]

The petition is granted. Petitioner will be released from confinement unless within 30 days the State proceeds to retry him. It is so ordered.

This opinion should end as it began—observing that, whatever may have been

true elsewhere, petitioner has been represented here by assigned counsel serving with skill and loyalty, for which the court is grateful.

---

6. Harrison's recommendation to Thomas to waive a jury might have been sound strategy, or, at least, sound enough to afford no help to petitioner's claims here. It is impossible, however, to make even a cursory appraisal of such a matter in a setting of neglect and incompetence like that revealed by the present record.

7. Petitioner received a longer sentence on the robbery count (6–18 years) than on the attempted rape count (5–15 years), and the prosecution relied completely on the credibility of the complaining witness

concerning the alleged robbery. Thus, petitioner makes a point of substance when he argues that the failure to call witnesses who would cast doubt upon Miss Steinberg's credibility and corroborate his own story was surely prejudicial apart from its impact on the rape count. It is clear, moreover, that the trial judge deemed defendant's entire story a fabrication, and that this belief affected the length of sentence imposed. (Sentencing Transcript, pp. 8–9.)