Pat **PINNELL**, Appellant,

v.

Bill **CAUTHRON**, Sheriff of Sebastian County, Arkansas, Appellee.

No. 75–1861.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 10, 1976.

Decided Aug. 20, 1976.

Thomas A. Martin, Jr., Jasper, Ark., for appellant.

Robert A. Newcomb, Asst. Atty. Gen., Little Rock, Ark., for appellee; Jim Guy Tucker, Atty. Gen., Little Rock, Ark., on brief.

Before LAY, HEANEY and STEPHENSON, Circuit Judges.

HEANEY, Circuit Judge.

Pat Pinnell appeals the denial by the District Court[1] of his petition for writ of habeas corpus in which he contended that he was denied effective assistance of counsel at trial. We reverse.

Pinnell was convicted by a jury in the Sebastian County, Arkansas, Circuit Court of an assault with a deadly weapon. The jury sentenced him to one-year imprisonment and a fine of one thousand dollars, the maximum permitted by Arkansas law. His conviction was affirmed by the Arkansas Supreme Court *sub nom. Kerr v. State,* 256 Ark. 738, 512 S.W.2d 13 (1974), and his petition for certiorari was denied on January 13, 1975, *sub nom. Pinnell v. Arkansas,* 419 U.S. 1110, 95 S.Ct. 783, 42 L.Ed.2d 806 (1975). He commenced serving his sentence on February 28, 1975. His petition for a writ of habeas corpus was denied by the

District Court, and he appealed to this Court. We remanded the case to the District Court on February 13, 1976, and directed that additional testimony be taken from Darrell Johnson, his attorney at trial, and Marshall Carlisle, an attorney who also acted in Pinnell's behalf. The hearing was held on February 27, 1976.[2] On February 28, 1976, Pinnell was released from confinement after serving his one-year sentence, with the condition that he pay his fine in installments. He has paid three hundred and fifty dollars of the fine as of July 30, 1976.

On March 1, 1976, the District Court held that Pinnell had not been denied effective assistance of counsel at trial after considering the additional testimony, and suggested that the case was now moot since Pinnell had been released. Subsequently, the District Court transmitted its findings and a transcript of the hearing on remand to this Court.

Pinnell contends that he was denied effective assistance of counsel.

The District Court was in error when it suggested that the case was moot since Pinnell had been released from custody. It is well settled that

> once the federal jurisdiction has attached in the District Court, it is not defeated by the release of the petitioner prior to completion of proceedings on such application.

*Carafas v. LaVallee,* 391 U.S. 234, 238, 88 S.Ct. 1556, 1560, 20 L.Ed.2d 554 (1968).

Since Pinnell's petition was filed prior to release, the case is not moot.

The standard used by this Court in evaluating whether a defendant has been denied effective assistance of counsel is that

> trial counsel fails to render effective assistance when he does not exercise the customary skills and diligence that a reasonably competent attorney would perform under similar circumstances.

---

1. Honorable Paul X. Williams, United States District Court for the Western District of Arkansas.

2. A third attorney, Sam Sexton, also testified at the remand hearing.

*United States v. Joseph Ward Easter*, 539
F.2d 663 (8th Cir. 1976).

Under that standard, Pinnell was denied
effective assistance of counsel.

 Darrell Johnson was retained by
Sam Sexton, with Pinnell's consent, to rep-
resent Pinnell in this action and another
related civil matter in November, 1973.[3]
Johnson testified that he was contacted by
Sexton and that he had an understanding
with Sexton that he would be paid a fee of
five thousand dollars to represent Pinnell in
both matters, and that he received two
thousand dollars as down payment. Sexton
testified that he gave Johnson two thou-
sand dollars as a retainer, and suggested to
Johnson that if Johnson became embroiled
in time-consuming litigation in the civil
suit, some additional fee would be paid.
Sexton stated that he told Johnson that he
did not anticipate that Johnson would spend
much time with the matter.

This prediction was borne out. Johnson's
efforts in the civil case were confined to
filing a motion to quash the suit in Decem-
ber, 1973. The suit was dismissed with
prejudice, in January of 1974, after settle-
ment. Johnson was unaware that it had
been settled until he casually met Sexton on
the street in May, 1974.

Johnson's efforts on behalf of his client in
the criminal case from the date he was
employed, November 20, 1973, until the
date of trial, June 25, 1974, were also limit-
ed. In November and December, 1973, he
obtained an appearance bond, filed two rou-
tine motions for suppression and discovery.
He copied both motions from forms. He
had one brief meeting in chambers where
procedural matters were discussed.

From January through March, Johnson
did no work on the case. He had a single
phone conversation with Pinnell in which he
demanded more money. Johnson stated he
took no action on the case because he is a
member of the Arkansas State Legislature
which was in session during the period. He
stated that since he is a sole practitioner,

the sessions "always cripple me in my prac-
tice."

In the period from April through the date
of trial, Johnson filed another motion for
suppression which he copied from a motion
filed by an attorney for a codefendant in
the case. He also attended a hearing on
May 5, 1974, which involved a motion for
severance filed by another codefendant and
"I suppose motions to suppress." When
asked whether any evidence was taken at
the hearing or whether it was merely a
discussion of the legal merits of the mo-
tions, Johnson responded:

> It was not an evidentiary hearing. There
> was not as I recall even a court reporter
> present. It was simply in Judge Wolfe's
> chambers, a discussion in relation to cer-
> tain stipulations as I remember it, re-
> garding the tapes; certain stipulations on
> questions to be resolved regarding sever-
> ance for Mr. Sexton and Mr. Parker and
> their clients, and several other matters.

Johnson's recollection as to the events
which transpired at the hearing is in error.
A court reporter was present and the major
topic of discussion was the suppression of
the taped conversations. The court heard
the arguments put forth by the counsel for
the various codefendants and reserved his
ruling. Johnson's total contribution to the
hearing was to state that he had no objec-
tion to the severance of a codefendant when
asked by the court.

Johnson also testified that he and Pinnell
had several brief telephone conversations,
an accidental meeting at Sambo's restau-
rant and a meeting at his office during the
same period. It does not appear that the
substantive issues of the case were dis-
cussed but only Johnson's demand for more
money. At the last meeting, Johnson told
Pinnell that he would withdraw unless he
was paid five hundred dollars more. John-
son further testified that he had had no
communications with his client for at least
thirty to forty-five days prior to the morn-
ing of trial. Pinnell testified that he had

---

**3.** Sexton represented an adverse interest in the
civil suit and a codefendant in the criminal

action. Sexton testified that he was primarily
afraid of the civil matter.

attempted to contact Johnson further but that his phone calls were not returned.

On the Wednesday prior to the trial, Marshall Carlisle, an attorney and friend of Pinnell, telephoned Johnson and told him that Pinnell had contacted him about arranging a plea bargain. Carlisle said that he had agreed to do so but that he had told Pinnell that he would not represent him at the upcoming trial. Pinnell testified that he contacted Carlisle because he was worried about not being represented. Carlisle met that Wednesday evening and again on Thursday with Johnson. Carlisle testified that Johnson expressed relief that something was going to be worked out and that there would be no trial. Carlisle's negotiations were unsuccessful. Carlisle returned to Johnson's office where Johnson wrote a letter to the trial court asking for permission to withdraw from the case. Johnson gave Carlisle the Pinnell file and asked Carlisle to give the file to Pinnell. Johnson stated, in his letter to the court, that Carlisle had agreed to handle Pinnell's case. This was a patent falsehood as Johnson admitted at the hearing that Carlisle had not agreed to handle the case but only had agreed to attempt to negotiate a plea bargain and would not represent Pinnell at the trial.

When Carlisle met with Pinnell and told him of Johnson's request to withdraw, Pinnell asked Carlisle if the request would be granted. Carlisle said that he told Pinnell that he did not know but he was personally aware of the fact that Johnson had been the attorney of record for some time, that the request was coming right before trial was scheduled, that the trial judge would not look with favor upon the request and that the case "was a little bit different than the normal situation." Pinnell told Carlisle that he felt that he did not have an attorney, and Carlisle advised Pinnell to explain the situation to the court at the trial. It is apparent that Carlisle did not believe that Johnson would be permitted to withdraw.

When asked why he never informed Pinnell directly that he wished to withdraw from the case before the very day of trial, Johnson responded:

Communication between Mr. Pat Pinnell and me admittedly was not what it should have been. This is partly due to the fact that Mr. Pinnell did not have a telephone and after Marshall Carlisle came by and picked up the file I felt strongly that I was no longer involved in the matter; and another thing that is involved which is true of all attorneys that practice for any length of time is that Mr. Pinnell was not the only case that I had at the time.[4]

At the hearing, Johnson admitted that Pinnell had left a telephone number with him through which Pinnell could be reached had Johnson wanted to communicate with him.

The letter of withdrawal that Johnson wrote the court on Thursday, June 21, 1974, apparently did not reach the court until after trial began on Monday, June 25, 1974.

Johnson testified that he received a call at his office shortly after 9:00 A.M. on June 25, 1974, and was told to come to the court house immediately. Johnson testified that he arrived in a state of shock which lasted for three or four hours. Indeed, he arrived without the file which he had given away or even a note pad. Johnson informed the court that he thought he was out of the case and was not prepared, but did not formally request a continuance when the court told him that they were going to trial that day.

Johnson's defense of his client at trial was less than vigorous. Johnson stated that he was irritated, upset and not "psyched up." During the time he was in a "state of shock," the state introduced and had read to the jury the transcripts of the several tapes of conversations between Pinnell and a coconspirator who had volunteered to assist the state and which had been obtained by wiring the coconspirator. The tapes contained statements by Pinnell admitting to three prior crimes, including a

---

4. Johnson also indicated, at another point in his testimony, that since he had not received the additional five hundred dollars, his obligation to his client was at an end.

crime committed as a youth and a conviction for bookmaking, and that he was under investigation by the IRS. Johnson admitted that he was aware that such evidence was excludable and constituted a reversible error in Arkansas if admitted after proper objection. Johnson also admitted that he had read the transcript. Johnson, when asked whether he made any judgments while he read the transcripts as to their contents and how to handle them at trial, testified:

Well, I do not recall if I made any critical judgment at the time. I remember reading over two sets of transcripts. I know that they were highly damaging and in my judgment was that we had a lot of problems with those, you know, from the very beginning. I made no critical analysis at that time as to whether or not there was any prejudicial material in there.

Johnson further testified:

Let me explain it to you in this way, and I think you and everyone else will believe this answer. This trial, this thing had been set for six months. We knew the prosecuting attorney had the tapes. We knew he had promised us, assured us that they were going to be transcribed. I had not talked all that much about Mr. Pinnell, had not talked to him all that much about it. We had not discussed his conversation with Shamblee [sic]. When I received these transcribed copies of the tapes my emotion more than anything else was curiosity, just wanted to know what in the world, you know, what these guys had been talking about because I did not know—and I knew that Pinnell had been bugged but I did not know what the extent of the conversation, and I read the tapes the first time probably like I would read a dime novel trying to find out what, you know, what transpired between these two men.

Johnson made no objection to the admission of the tapes and the reading of the transcripts of the tapes to the jury. While he was aware that portions of the tapes were inadmissible, his mental state was that " * * * I might not have been thinking of it at that particular time due to my state of mind."

Douglas Parker, an attorney for a codefendant, testified that when Johnson was informed by the court that the case was going to be tried, "[h]e just sort of threw up his hands, and from that moment on he just more or less sat out there." Parker further stated:

He made no opening statement, as I recall, he made no closing statement. I more or less had the attitude he made no attempt whatever to defend the man. Of course, I was defending Kerr, representing Mr. Donald Kerr, really it is not my concern as far as Pinnell was concerned. But I was somewhat shocked by his performance at that trial or lack of performance.

Parker testified, when asked if Johnson's defense could have been termed strategy, that:

I don't know what you classify as strategy. As far as I'm concerned, he just did not represent the man at the trial. I think he possibly cross examined Shambley [sic], as I recall, may have asked him a few questions. Other than that he made no objections, made no record whatsoever. He usually sat with a sort of lack of physical attitude. It was evident that he was irritated simply because he had to be present.

It is obvious from an examination of the facts stated above that counsel was grossly incompetent. Johnson had interviewed no witnesses, had minimal or no discussion with his client about possible defenses, had not discussed the tapes with his client, had not discussed with his client his client's possible testimony, had failed to object to the admission of the tapes and the reading of the transcripts, had cross-examined and then only briefly and perfunctorily one witness, had failed to give an opening or closing argument and, in the words of Mr. Parker, "did not represent the man [Pinnell] at the trial." The bar's noble tradition of advocacy has here been abandoned for what only can be described as "money grubbing." Under the standard we announced

above, counsel was incompetent and Pinnell was denied effective assistance of counsel at trial.

Our Court has previously held that a petitioner must not only show that counsel was incompetent but that counsel's incompetency resulted in prejudice. We find such prejudice here. *See United States v. Joseph Ward Easter, supra,* and cases cited therein. We cannot say beyond a reasonable doubt that the verdict of the jury was not influenced to Pinnell's prejudice by the reading of the transcripts containing Pinnell's admissions of prior convictions which should have been excluded but to which counsel did not object, by counsel's failure to interview witnesses and prepare the case prior to trial and by counsel's absolute failure to defend his client at trial. Furthermore, we cannot say that the jury's determination to sentence the defendant to the maximum penalty was similarly unaffected by the foregoing factors.

The conviction is reversed.