**John NELSON, Jr., Petitioner,**

v.

**Harold J. SMITH, Superintendent, Attica Correctional Facility, Respondent.**

**CV–80–1062.**

United States District Court,
E. D. New York.

Jan. 8, 1981.

Patterson, Belknap, Webb & Tyler by Mark R. Hellerer, Frederick J. Baumann, Rudolph W. Giuliani, New York City, R. Nils Olsen, Jr., Buffalo, N. Y., for plaintiff.

Eugene Gold, Dist. Atty., Kings County, by Lee F. Wasserman, Brooklyn, N. Y., Robert Abrams, Atty. Gen. of the State of N. Y. by Joseph G. Homsy, Asst. Atty. Gen., Buffalo, N. Y., for defendant.

## MEMORANDUM AND ORDER

WEINSTEIN, Chief Judge:

Petitioner, convicted some ten years ago in the state court of murdering a United States Customs official, seeks a writ of habeas corpus. His claims are in essence that he was denied the assistance of counsel during critical periods following his arrest when his claim of an alibi could have been investigated and established; that the court made serious errors at trial, the most important of which were in allowing his coerced confession to be used, in restricting cross-examination of a witness to whom petitioner had sold a service revolver taken from the victim and in denying a *Wade* hearing on suggestions made to an identifying witness; and that the prosecution failed to reveal exculpatory evidence.

Appointed counsel for petitioner have done a superb job of researching the law, obtaining all available evidence, conducting a full evidentiary hearing in this court and briefing and arguing the case. They have not, however, been able to overcome two impediments of fact and one of law. First, petitioner lied at his hearing in this court with respect to every material aspect of his

testimony; he was not a credible witness. Second, a close study of the record in the state court shows beyond any reasonable doubt that defendant was guilty as charged; was well represented at a critical suppression hearing and at the trial; that, although the state trial judge was possibly overly intrusive, by the time petitioner's counsel and counsel for co-defendants had thoroughly examined and cross-examined the witnesses, the issues had been fully explored; and that no substantial exculpatory evidence was unknown to petitioner at the time of his trial.

■ The legal problem counsel have not been able to meet successfully is that although petitioner was denied effective counsel prior to trial, the low "farce and mockery" standard of this circuit was not violated. The various appointed and retained counsel did not, during the months prior to trial, give petitioner's case the kind of attention that a murder case warranted. This was not the finest hour either of Legal Aid, appointed private counsel, the state's system of administration of justice, or privately retained counsel up to the point where trial counsel took over.

■ If there were any substantial chance that the current alibi story of petitioner had any element of truth, or that it might, if told at trial, have affected the verdict, the writ should be granted, for counsel clearly made no attempt to verify defendant's claims while the memory of witnesses was fresh and critical dates could be verified. But it is highly probable that the detailed alibi story told at the hearing in this court was a concoction cooked up long after the conviction. It was never reported in the form now claimed to state counsel, to petitioner's mother, to the police or to the assistant district attorney who took the confession a week after the killing. It had no basis in fact and prompt investigation would, with a high degree of probability, have demonstrated it to be a fabric of lies. Thus it is clear beyond a reasonable doubt that more effective counsel prior to trial would not have changed the result. Petitioner was doomed when he shot down his victim and he sealed his fate with his full voluntary confession a week later. No legal skills could have saved him thereafter.

## The Killing

Petitioner with two companions spent the day of the tragedy getting high on cocaine and heroin. After wandering around their local bars and other hangouts they decided to "make some money" that night. The tools and skills these three nineteen-year old young men had at hand for this enterprise were not extensive, but they were adequate. Petitioner, a high school dropout, owned a semi-automatic thirty-two calibre pistol which had been test fired and still contained two live shells; one of his companions had borrowed a stolen green sports car from a friend and could drive; the third of the group, petitioner's cousin, Brown, had had experience in conducting muggings—he specialized in going through the victims' pockets.

The three drove to a suitable neighborhood where petitioner and his assistant left their chauffeur to pass the time listening to the radio. They approached a chance victim in the street with the petitioner's gun held at the ready; the assistant, Brown, seized a wallet and a government issued gun; a fatal shot was fired by petitioner; the two ran to the car and made their getaway. In the wallet they found twenty-five dollars and an advice of rights card; the document alerted them to the fact that their victim was a law officer. Petitioner's explanation of the shooting to his panicked associates was that the victim had made a threatening gesture.

Two young ladies walking nearby heard the shot and saw two blacks running from the scene as the deceased was falling to the ground. A young man sitting on his porch saw them run to a car closely resembling the one borrowed and driven by another young black who drove away at high speed. Apart from race, none of these three witnesses could make any identification.

The person to whom petitioner sold the deceased's gun for seventy-five dollars and

some heroin made a courtroom identification. From time to time, he had seen petitioner around one of the local bars. He also identified the gun whose serial numbers tied it to the deceased.

Ballistic analysis indicated the shooting was by a thirty-two calibre semi-automatic weapon. It was of the type petitioner owned. This gun was not produced at the trial and no further ballistic evidence was introduced.

### The Confessions

Early one morning about a week after the crime an Assistant District Attorney and stenographer took the confessions of petitioner's two associates. Petitioner was then arrested in his home and brought to the station house about five a. m. He began to talk, broke off his statement, conferred with his mother and then gave a full confession.

The stenographic record of these three statements is unquestionably accurate. They are interlocking in detail and have a ring of sincerity and truth in their homey particulars. The heart of the petitioner's statement reads as follows:

.     .     .     .     .

A  I don't know the exact time we left. We drove over to the neighborhood. It might have been about fifteen blocks from here. I can't remember the street. It was me and Freddie and Cavrel. I seen a guy walking down the street by his self and I didn't see anybody else. I never seen the man before in my life. We got out of his sight and walked around on the opposite side of the street. We crossed the street on an angle to meet him. Just then, we got to him. I told him to freeze, and I grabbed the only hand he had free. He had his left hand free and was carrying something in his right hand. My cousin went through his pockets and I was looking at the man the whole time. My cousin said that he had found a gun, and he took the gun and put it in his pants or something. He said let's go. He walked. He took about two or three steps and the man swung at me and I fired one shot and I ran. I ran to the corner and around the corner, past the car, and I waited around the corner for the car to come around. The only thing I said, I asked Freddie what the fuck was wrong with him driving so slow, and all three of us panicked and shit I had no previous intention. I thought after the shot. I thought about it. We got back in our neighborhood. I thought he was only wounded because I had the gun to his shoulder.

Q  How far away were you from him when you shot the gun?

A  Standing right next to him. I didn't even see when he fell. That's how fast I ran.

Q  When you say your cousin went through his pockets, who is your cousin?

A  Cavrel Brown.

Q  You found the gun?

A  Uh huh.

Q  What kind of a gun?

A  I found out later it was a 357 magnum.

Q  What did it look like?

A  Nickel plated, brown wooden handle.

Q  Did he have anything else on him?

A  At that time he didn't mention anything else.

Q  What about a wallet?

A  When we got back in the car, he handed me some money. He said—I believe it was twenty-five or something like that.

Q  Did he show you a wallet?

A  No, I didn't even see a wallet.

Q  Did your cousin Brown say where he got the twenty-five dollars from?

A  Came out of the wallet.

Q  He said it came out of the wallet?

A  He didn't say it. I know it came out of the wallet. Let me be more specific. When I say I never seen it, I never held it. I never went through it. I know he had the wallet and I never went through the wallet. I knew he had it and went through it.

Q  You saw Brown with the wallet?

A    Yes.

Q    Was this in the car?

A    Yes.

Q    What did you do with the gun?

A    I kept it on me for about three hours. After we got back to our neighborhood, around Saratoga Avenue and Atlantic, and then I tried to sell it. And a friend of mine introduced me to a guy named Wallace or Wally.

Q    What happened with Wally?

A    When we got introduced, we went to the back of the bar. I showed him the gun. I told him that I had several others that I had got from down south and they weren't hot, and he said it's just what he'd been looking for. And he said how much did I want for it. I told him I was getting $150.00. He told me he didn't have but seventy-five dollars. He said he was going to pick up some stuff. He made an agreement to meet me in the bar either that night or the next day and I was going to pick up a spoon of heroin.

Q    Is that when you gave him the gun, when he gave you the seventy-five dollars?

A    Yes.

Q    Which bar was this?

A    Late Late Show.

Q    What about your gun?

A    The .32?

Q    Yes.

A    The last time I seen it it was Friday morning on the table in the kitchen before the officers came in the hallway. I was looking out the peephole.

.    .    .    .    .

■    The hearing on the voluntariness of the confessions was a full and fair one. Petitioner's claim that he was abused in the station house or en route from his home before he confessed is belied by the time sequences confirmed by his mother and the testimony of the arresting police and the assistant district attorney. He was brought from the station house between four and five a. m. and he confessed shortly after five. There is talk about his being high on drugs, but his mother confirmed that he had slept around the clock, he appeared alert to all who saw him that morning and his statement shows no sign of confusion. He was repeatedly given full warnings of his rights; when he wanted to stop his statement, the assistant district attorney immediately withdrew, and only after petitioner spoke to his mother and requested that the interview continue was the rest of petitioner's statement taken. Petitioner was no neophyte; he had previously confessed to another crime and pleaded guilty.

The trial court was justified in holding the statement admissible. Petitioner's testimony before this court with respect to coercion was untrue. No *Bruton* issue is in the case because the confessions dovetailed so neatly in practically all particulars. There were extensive redactions to eliminate references to other crimes of petitioner and his co-defendants.

### The Trial

The three culprits were tried together. The critical evidence has already been mentioned. Added to it was identification of the deceased, necessary autopsy information on cause of death and some collateral information.

Petitioner's trial counsel was obviously held in high esteem by the court who referred to him consistently as "judge." Counsel's grasp of the law and his handling of the facts and of witnesses cannot be justly criticized. His summation, particularly when considered with that of other defense counsel, was excellent. He fully protected petitioner's trial rights.

The purchaser of the deceased's gun, one Wally Walder, was a key witness. His testimony was consistent with petitioner's confession. In addition, since he had "seen him around the bar," there were none of the usual eyewitness dangers that otherwise might have been a matter of concern. Cross-examination established that the purchaser was shown many pictures in a nonsuggestive way. A separate *Wade* hearing could not have led to suppression.

Defense counsel were granted a continuance to investigate Walder's background with permission to recall him and their cross-examination was thorough and effective. The court's interference was undoubtedly frustrating to the defense, although some of it was required because the witness did not keep his voice up. Any unnecessary pedantry of the trial judge in restricting cross-examination did not constitute constitutional error for defense counsel impeached Walder about as thoroughly as would have been possible in the most benign of courts.

Internal memoranda indicated a possible deal Wilder had made with the District Attorney; they should have been revealed to the defense. But even without documentation it was apparent from the cross-examination that this witness was cooperating to avoid his own prosecution on a gun charge.

*Post-trial Procedures*

After a jury verdict of guilty of felony-murder and the denial of various motions, petitioner was sentenced to twenty-five years to life. The judgment was affirmed on appeal. Numerous pro se post appeal proceedings in the state and federal courts raised almost all conceivable constitutional and other issues. All were dismissed.

The instant petition for a writ of habeas corpus was filed in the United States District Court for the Western District of New York and transferred to the Eastern District. Petitioner was transported to the Federal Metropolitan Correction Center where counsel could consult with him while they gathered evidence. There was then a full evidentiary hearing in this court. The issues were thoroughly briefed and argued.

At the hearing petitioner was his own main witness. Even without considering the instant conviction—i.e., treating it as a nullity for purposes of assessing credibility—petitioner made a bad impression on the court. As already noted, the court believes he lied in all important particulars and it gives no weight to his testimony. His mother's testimony confirms what she said at the trial and apart from her describ-

ing the neglect of his attorneys, gives no support to petitioner's claim of a possible substantial alibi defense or of coercion. Apparently petitioner had not even mentioned the possible alibi witness, Johnny Williams, to her although she acted as a go-between to counsel.

Johnny Williams testified at the hearing that the petitioner from time to time visited with him in New Jersey and spent the night there. Understandably, he could not fix the date of any visit ten years ago. Petitioner's testimony at the hearing that he visited Williams on the night of the killing and therefore had an alibi was, this court finds, a lie. Although certainty on this score is not now possible, based on the court's observation of Williams at the hearing, it is manifest that even if he had testified for petitioner at the trial that they had spent the evening together on the night of the murder, he would not have been believed by the jury.

Trial counsel was retained by the mother. He is dead. His files have no useful information.

The one reliable piece of evidence helpful to petitioner on his alibi claim is the affirmation of Richard K. Smith, Esq., who was assigned by the court on March 18, 1971, seven days after the March 11th killing. Although petitioner had been expressing dissatisfaction with him for some ten months, Smith was not relieved until February 22, 1972. He has no recollection of dates or details but he affirms:

> I visited Mr. Nelson once at Riker's Island to discuss the matter with him. At that time *he mentioned an alibi, but I did nothing to check it.*

(Emphasis added.) This visit apparently took place in July, five months after the homicide. By the time of trial the alibi defense was hopeless even if the trial court would have permitted it. See New York Criminal Procedure Law § 250.20 (requirement of prompt notice of alibi). These failures were compounded by a series of Legal Aid attorneys who appeared in the case at various times on bail and adjournment mo-

tions. They never consulted petitioner, investigated any possible claim of alibi or gave the required notice of an alibi defense.

■ Smith's admission is a damning self-indictment. Failing to investigate a claim of alibi in a murder case for months after an arrest demonstrates lack of adequate counsel. It is a per se violation of the Sixth Amendment. *See Rummel v. Estelle*, 498 F.Supp. 793 (D.C.W.D. Tex., San Antonio Div. 1980); 590 F.2d 103, 105 (5th Cir. 1979). In view, however, of this circuit's majority opinion in *Brinkley v. LeFevre*, 621 F.2d 45 (2d Cir.), *cert. den.*, —— U.S. ——, 101 S.Ct. 203, 66 L.Ed.2d 87 (1980), and its insistence that a very low level of representation suffices—the "farce and mockery" standard—a grant of the writ based solely on this factor is not possible.

The rule in other circuits is more favorable to the accused. *See, e.g., United States ex rel. Washington v. Maroney*, 428 F.2d 10 (3d Cir. 1970); *Coles v. Peyton*, 389 F.2d 224, 226 (4th Cir.), *cert. den.*, 393 U.S. 849, 89 S.Ct. 80, 21 L.Ed.2d 120 (1968); *King v. Beto*, 305 F.Supp. 636 (S.D.Tex. 1969), *aff'd per curiam*, 429 F.2d 221 (5th Cir. 1970), *cert. den.*, 401 U.S. 936, 91 S.Ct. 921, 28 L.Ed.2d 216 (1971), 91 S.Ct. 921; *United States ex rel. Williams v. Twomey*, 510 F.2d 634 (7th Cir.), *cert. den.*, 423 U.S. 876, 96 S.Ct. 148, 46 L.Ed.2d 109 (1975); *Pinnell v. Cauthron*, 540 F.2d 938 (8th Cir. 1976); *Brubaker v. Dickson*, 310 F.2d 30, 39 (9th Cir. 1962), *cert. den.*, 372 U.S. 978, 83 S.Ct. 1110, 10 L.Ed.2d 143 (1963); *McQueen v. Swenson*, 498 F.2d 207 (8th Cir. 1974), *later app.*, 527 F.2d 579 (8th Cir. 1975) and 537 F.2d 976 (8th Cir. 1976), *on remand*, 425 F.Supp. 373 (E.D.Mo.1976), *reversed*, 549 F.2d 570 (8th Cir. 1977) and 560 F.2d 959 (8th Cir. 1977); *cf. United States ex rel. Thomas v. Zelker*, 332 F.Supp. 595, 600 (S.D.N.Y.1971). *See also* authorities collected in *Brinkley v. LeFevre*, 621 F.2d 45, 47 (2d Cir.), *cert. den.*, —— U.S. ——, 101 S.Ct. 203, 66 L.Ed.2d 87 (1980) (Weinstein, J., dissenting).

■ An attorney's failure promptly to confer with his client, to elicit facts relevant to a defense, to ascertain that certain defenses are unavailable, to conduct a factual and legal investigation, or otherwise to reflect upon and prepare the defendant's case constitutes denial of effective assistance of counsel. *Coles v. Peyton*, 389 F.2d 224, 226 (4th Cir.), *cert. den.*, 393 U.S. 849, 89 S.Ct. 80, 21 L.Ed.2d 120 (1968). As Judge Frankel aptly put it:

> ... timely appointment becomes a cruel joke when the defendant officially has a lawyer, but is actually being ignored. ... the failure to interview witnesses 'whose testimony may or may not have been favorable' has been a central factor among those showing that the adequacy of the representation fell below the constitutional minimum.

*United States ex rel. Thomas v. Zelker*, 332 F.Supp. 595, 600 (S.D.N.Y.1971) (citations omitted).

Typical of closely analogous fact patterns is *McQueen v. Swenson*, 498 F.2d 207 (8th Cir. 1974). Petitioner, convicted of murder in 1964, challenged the adequacy of his appointed attorney's pretrial investigation. The testimony indicated that while counsel had visited him in jail between December 1963 and June 1964, the discussions related primarily to other pending charges. Between June and the commencement of his trial in September 1964, the petitioner never saw his attorney—in fact, "it was not until the actual trial that [he] was able to discuss [the homicide] with his attorney." *Id.* at 211. Although petitioner had apparently suggested leads to his counsel, they were neither followed up nor were any of the prosecution's witnesses interviewed. As the court concluded:

> ... the only factual conclusion that can be drawn from the [evidentiary] hearing is that attorney Brown's sole preparation for the defense of a client charged with first-degree murder was to interview the defendant himself.... [W]e hold the lack of pretrial investigation amounts to ineffective assistance of counsel.

*Id.* at 213. The court in *McQueen* took that case as an opportunity to revise its standard for the determination of ineffective assistance and to abandon the "farce and mock-

ery" test as inadequate. *Id.* at 215. *See also, McQueen v. Swenson,* 560 F.2d 959 (8th Cir. 1977).

In *United States ex rel. Williams v. Twomey,* 510 F.2d 634 (7th Cir.), *cert. den.,* 423 U.S. 876, 96 S.Ct. 148, 46 L.Ed.2d 109 (1975), the court held that while the appointment of counsel on the very day of trial for burglary was not *per se* ineffective, the circumstances warranted *habeas* relief. Williams was arrested on April 12, 1968 and remanded; he was not arraigned until July 31, 1968, at which time the trial court appointed the local public defender's office to represent him. Without even having met petitioner, an attorney from that office filed routine motions on his behalf that day; no attorney ever met with petitioner before his trial. On the day of his trial, the petitioner conferred with a different attorney from the public defender's office for approximately ten minutes in the bullpen at court; at that time, petitioner informed his new counsel of the existence of four potential alibi witnesses. *Id.* at 636. Notwithstanding the total unfamiliarity of this attorney with petitioner's case and his failure to search out any of the petitioner's alibi witnesses, the trial court permitted the petitioner to "elect" to go forward with his trial at that time. Although the Seventh Circuit broadened its constitutional test in the case, the case was characterized as "close" even under the farce and mockery rule.

*McQueen* and *Williams* would be authority for granting the writ in the Seventh, Eighth and all other circuits. Until the Second Circuit brings itself into line with the rest of the federal courts, these cases are not helpful to petitioner here. *See Brinkley v. LeFevre,* 621 F.2d 45 (2d Cir.), *cert. den.,* —— U.S. ——, 101 S.Ct. 203, 66 L.Ed.2d 87 (1980). In any event, since more diligent counsel would not have affected the result, the writ may not issue. *See, e.g., Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705, *rehearing den.,* 386 U.S. 987, 87 S.Ct. 1283, 18 L.Ed.2d 241 (1967); *Moore v. Illinois,* 434 U.S. 220, 98 S.Ct. 458, 54 L.Ed.2d 424 (1977), *on remand,* 577 F.2d 411 (7th Cir. 1978), *cert. den.,* 440 U.S. 919, 99 S.Ct. 1242, 59 L.Ed.2d 471 (1979); *United States v. Williams,* 523 F.2d 407, 410 (2d Cir. 1975).

## The Other Claims

One missing piece of evidence petitioner's counsel have not been able to trace is the murder weapon. It apparently was last in petitioner's possession. Possibly petitioner could have given his trial counsel some leads to its location, but there was no point in doing so since the ballistics evidence would then probably have tied the markings on the slug to the weapon petitioner used. It is for this reason, and not because of any hiding of evidence by the state, that this lead was not followed. There was no violation of *Brady* in failing to reveal a statement of Stephen Newkirk, an erstwhile criminal associate of petitioner, referring to this weapon because Newkirk's information was inculpatory.

None of the other contentions of petitioner has any merit.

## Conclusion

The petition is dismissed. A certificate of probable cause is granted. The claim of inadequacy of counsel is serious and warrants appellate review.

The court again expresses its appreciation to pro bono counsel Mark R. Hellerer, Frederick J. Baumann and Rudolph W. Giuliani for their representation in the highest tradition of the bar. Similarly fine work was done when the case was still in the Western District of New York by Rolf Nils Olsen, Jr., Esq. and Barry Ginsberg, a third year law student at State University of New York at Buffalo.