John Wesley KELLY, Jr.

v.

WARDEN, HOUSE OF CORRECTION.

Civ. A. No. M–76–1628.

United States District Court,
D. Maryland.

March 9, 1979.

Luther C. West, Baltimore, Md., for plaintiff.

John P. Stafford, Jr., Asst. Atty. Gen., Baltimore, Md., for defendant.

MEMORANDUM AND ORDER

JAMES R. MILLER, Jr., District Judge.

### I. Posture of Case:

The petitioner was convicted of first degree murder in the Criminal Court of Baltimore and was sentenced to life imprisonment on February 28, 1971. This is petitioner's fourth petition for habeas corpus relief. Petitioner is now alleging that trial counsel incompetently failed to investigate and present evidence at trial and at a sup-

pression hearing that petitioner was suffering from narcotic withdrawal sickness at the time when he made incriminating statements to the police which were used against the petitioner at trial.[1]

An evidentiary hearing was held on this petition for habeas corpus relief on October 27, 1978. The court is satisfied that the petitioner did not deliberately and intentionally waive his right to assert this competency of counsel claim in his prior habeas corpus proceeding in this court. This court will, therefore, consider the merits of his claim at this time.

As to the investigation aspect of his claim petitioner alleges that trial counsel should have attempted to locate and interview the police officers who initially picked up petitioner on May 21, 1970 for questioning at the Central Police Station in order to determine if their testimony would have corroborated his allegation that he was then undergoing heroin withdrawal symptoms. Petitioner also alleges that trial counsel should have inquired at the "blood bank" for any records which would establish the petitioner's drug habit[2] and should have established the needle marks that allegedly were on petitioner's arms.[3]

As to trial counsel's failure to pursue the matter at trial petitioner alleges that his counsel failed to cross examine Detective Corbin concerning a statement allegedly made at an appearance on May 22, 1970 before Judge Broccolino to the effect that the petitioner had requested medical aid.[4] The petitioner also alleges that in pursuing the matter at trial, trial counsel should have called the petitioner to the stand at the suppression hearing to testify about his withdrawal symptoms.[5]

## II. Legal Standard:

Petitioner asserts that once he has shown an act or actions of defense counsel which are not within the range of accepted competence of a defense attorney, (*Marzullo v. Maryland*, 561 F.2d 540 (4th Cir. 1977)), he has met his burden and the writ should issue. The respondent alleges that the petitioner must do more and must demonstrate the existence of (1) an incompetent act or action on the part of his trial counsel and (2) prejudice to the defendant resulting from the incompetent act or actions.

The legal standard by which habeas corpus claims of inadequacy of trial counsel should be measured has been addressed by various United States Courts of Appeals with differing results. The Sixth Circuit and Ninth Circuit are of the view that once ineffective assistance of counsel has been shown there is no necessity for the habeas corpus petitioner to show prejudice. *Cooper v. Fitzharris*, 551 F.2d 1162 (9th Cir. 1977); *Beasley v. United States*, 491 F.2d 687 (6th Cir. 1974). On the other hand, the Eighth Circuit and, more importantly, the Fourth Circuit require some showing of prejudice before a guilty verdict will be overturned for ineffective assistance of counsel. *Reynolds v. Mabry*, 574 F.2d 978, 980 (8th Cir. 1978); *Wood v. Zahradnick*, 578 F.2d 980, 982 (4th Cir. 1978); *Rinehart v. Brewer*, 561 F.2d 126, 131 (8th Cir. 1977), citing the two step analysis of *United States v. Easter*, 539 F.2d 663, 666 (8th Cir. 1976) and *Crismon v. United States*, 510 F.2d 356, 358 (8th Cir. 1975).

In *Wood v. Zahradnick, supra*, the Fourth Circuit remanded to the district court to inquire whether defense attorney's failure to seek psychiatric evaluation of the defendant was "harmless beyond a reasonable

---

**1.** The suppression hearing was conducted at mid-trial without the presence of the jury.

**2.** Transcript p. 422. Apparently the petitioner alleges that the "blood bank"—a place in which cash is paid for blood donations—had some records which would corroborate petitioner's drug habit.

**3.** Transcript p. 422.

**4.** Petition for Writ of Habeas Corpus at 6. The court has not been furnished with a transcript of the said court appearance of the petitioner.

**5.** This issue was raised by the court in its Order dated April 28, 1978 (Paper # 8) at 3. Neither party addressed the issue at the evidentiary hearing held on October 27, 1978 nor in their pleadings (Paper Nos. 1 and 3).

doubt." Noting that a potential basis for an insanity defense would have existed if it had been shown at the trial that the defendant was subject to a psychotic reaction to alcohol, the court instructed the district judge on remand to procure a psychiatric examination of Wood to determine whether he could have been subject to a psychotic reaction to alcohol at the time of the offense.

■ After examining many "ineffective assistance of counsel" cases, the court concludes that the most appropriate way to treat them, at least in situations where the criminal defendant was actually represented by an attorney and the claimed default is a failure to investigate or pursue a factual matter, is to recognize that there is, in reality, a three step analysis to complete:

1. Did trial counsel act in a manner different from the manner in which reasonably competent counsel would have acted?

2. If so, did the incompetent acts or omissions of trial counsel deprive the defendant of potentially useful facts or admissible evidence for use in cross-examination, in motions or in his case in chief?

3. If so, was the deprivation of the defendant of potentially useful facts or admissible evidence harmless beyond a reasonable doubt? In many, if not most, instances the second and third steps of this analysis are combined where it is apparent that an affirmative answer in the second step necessarily, in the circumstances, would require a negative answer in the third step.[6]

■■ In most cases the principal utility of using the above three step analysis is to identify the pertinent issues, to conceptualize the shifting burden of proof and to ascertain upon whom the burden rests in each step. It is settled law by now that the initial burden (or step one) is upon the petitioner in a habeas corpus petition. *Johnson v. Zerbst,* 304 U.S. 458, 468–469, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938); *Clayton v. Haynes,* 517 F.2d 577 (4th Cir. 1975); *Hall v. Warden, Maryland Penitentiary,* 313 F.2d 483, 487 (4th Cir. 1963). It would seem equally well settled that in step three, once the petitioner has established that he was deprived of potentially useful factual or legal material, evidence or information at his trial as a result of incompetent acts or omissions of his trial counsel, the burden is on the habeas corpus respondent to prove that such deprivations were harmless beyond a reasonable doubt. *Fields v. Peyton,* 375 F.2d 624 (4th Cir. 1967). The question that remains, therefore, is upon whom does the burden of proof as to step two fall?

■ The burden must fall upon the petitioner to demonstrate an affirmative answer to the second step in the analysis. Judge Bright of the Eighth Circuit stated in *McQueen v. Swenson,* 498 F.2d 207, 220 (8th Cir. 1974)[7] (quoted in *Reynolds v. Mabry,* 574 F.2d 978, 980 (8th Cir. 1978)):

"We believe a flexible approach . . . is called for. We ought not to intervene in the criminal process unless and until it can be shown that the alleged error itself prejudiced the petitioner in obtaining a fair trial. But this is not to say that, on remand, petitioner must prove his innocence even by so much as a preponderance of the evidence; nor should we be understood to suggest that the Court may trespass upon what properly would have been the jury's province of weighing the truth or falsity of this evidence at the original trial. What we are saying is that, here, the petitioner must shoulder an initial burden of showing the existence of admissible evidence which could have been uncovered by reasonable investiga-

---

**6.** For instance in *Wood v. Zahradnick,* 578 F.2d 980, 982 (4th Cir. 1978), the court assumed that if factual prejudice were shown (i. e. the psychiatrist ruled that the defendant could have been subject to a psychotic reaction) that it would not have been harmless beyond a reasonable doubt.

**7.** After remand the district court held that the petitioner, while having shown that potentially useful facts and admissible evidence had been denied him, beyond a reasonable doubt was not prejudiced by the denial. The Court of Appeals reversed the district court's opinion in *McQueen II,* 560 F.2d 959 (8th Cir. 1977), but did apply the three part analysis, 560 F.2d at 961.

tion and which would have proved helpful to the defendant either on cross-examination or in his case-in-chief at the original trial. Once this showing is made, a new trial is warranted unless the court is able to declare a belief that the omission of such evidence was harmless beyond a reasonable doubt."

498 F.2d at 220.

### III. Failure to Investigate

Petitioner's first contention is that his trial counsel failed to investigate defendant's allegation that he was suffering from narcotics withdrawal at the time that he made the statements to police. Specifically petitioner alleges that trial counsel should have contacted and interviewed the Western District police officers who initially picked up the defendant on May 21, 1970 [8] and should have contacted the "blood bank" [9] to corroborate that petitioner was undergoing withdrawal from heroin at the time that the statements were made.

■ At the evidentiary hearing held by this court on October 27, 1978, the court found that trial counsel knew that the petitioner was claiming that he was undergoing withdrawal from heroin at the time his statements to the police were made. The court further ruled that, as a matter of law, trial counsel should have investigated this possible evidence which could bear directly on the voluntariness of the statements made by the petitioner to the police. Therefore, the court has ruled that the first part of the petitioner's burden has been met.

■ As stated above, however, the petitioner has the burden of showing that had trial counsel contacted the Western District police officers or the blood bank, he would have obtained at least some corroboration of petitioner's withdrawal sickness allegations. No evidence has been presented by petitioner to demonstrate that had the trial counsel investigated as requested he would have uncovered evidence helpful to the defendant's withdrawal allegations. Because petitioner has not met his burdens on the second step of the analysis, he cannot prevail on the failure to investigate issue.

### IV. Failure to Follow Up:

Petitioner alleges two further acts of incompetence on the part of trial counsel. The first is a failure to cross examine Detective Moore or Detective Corbin concerning a statement made to Judge Broccolino by Detective Corbin in court on May 22, 1970.[10] The second is trial counsel's failure to put the defendant on the stand to testify (concerning the defendant's withdrawal sickness at the time the statements were taken) at the suppression hearing held outside the presence of the jury.

The petitioner's trial counsel, during an evidentiary hearing before Judge Anselm Sodaro prior to the commencement of the criminal trial, questioned Detective Moore as follows relating to events which occurred before Judge Broccolino at a bail hearing on May 22, 1970:

"Q. Detective Moore, were you along side of Detective Corbin on that particular morning at the preliminary?

A. Yes.

Q. Could you have heard everything that Detective Corbin said?

A. Yes.

Q. Did Detective Corbin tell the Judge or make a statement that this young man needed medical treatment?

A. Detective Crobin spoke for the defendant and stated that the defendant had requested that he have medical treatment.

---

**8.** At the evidentiary hearing conducted by this court on 10/27/78, petitioner testified that the officers who initially picked him up had to pull the police car over on the way to police headquarters to allow the defendant to vomit.

**9.** At the evidentiary hearing conducted by this court on 10/27/78, petitioner testified that he had gone there to procure money to support his drug habit and that the "blood bank" had records showing that defendant was a drug addict. Transcript of trial at 41.

**10.** At the in-court appearance Judge Broccolino waived the preliminary hearing and referred the case to the grand jury (Trial Transcript at 16–28).

THE COURT: What?

THE WITNESS: He did not state that the defendant needed medical treatment. He said that the defendant had requested of him that he receive medical treatment and he relayed this to His Honor Judge Broccolino.

MR. RICHARDS:

Q. *On this particular morning, Detective Moore, did it appear to you that John Kelly was going through withdrawal symptoms, narcotic withdrawal symptoms?*

A. *No, sir.*"

(Emphasis added). (Transcript at 27–28).

The petitioner, immediately after a luncheon recess following Detective Moore's testimony, was called to testify under oath before Judge Sodaro at the motions hearing prior to the commencement of the criminal trial. The exchange was as follows:

Question by Kelly's attorney:

"You have heard what Detective Moore said and what we are talking about now?

"Answer: Right.

"Q. Our first Motion to Quash. All right. Now tell his Honor in reference to the preliminary hearing, 9:00 a. m. court at central on 5/22/70, just what you have to say to repute what the officer said, or Detective?.

"Answer: Well, Detective Corbin stated that I had a mental problem and should see the medical examiner immediately, which I didn't. And so I feel as though that was testimony given by the officer at that time and therefore I feel as though that was the preliminary hearing at which the Constitution states that no person, every person has a title and is guaranteed counsel to advise him. I feel my Constitutional rights have been violated.

THE COURT: Anything else you want to say?

THE WITNESS: Yes I have. Plus there are certain other parts of this Constitution that has decisions that have been handed down. It says no man should stand alone, formal or informal in court or out of court and I believe I stood alone

at the preliminary examination. I had requested counsel.

THE COURT: All right. Anything else you want to say?

THE WITNESS: Not at this moment." (Tr. 30–31).

After Judge Sodaro denied motions to quash the indictment and dismiss the indictment, petitioner's trial counsel, stating that he was doing so at petitioner's request, moved to suppress any and all statements made by petitioner on the ground that his arrest was illegal. After reciting certain legal citations which had apparently been provided to him by petitioner, trial counsel stated as follows:

"And is there anything you want me to add, John, to this third argument and motion to suppress all the evidence? Due to an illegal arrest?

THE WITNESS: If any statements are allegedly supposed to have been made was used by police brutality. Because it not only can be used, police brutality by beating you, as a mental force at the same time. *Because I am and was at that time a drug addict, and I was going through withdrawal symptoms. So any statements that I so allegedly supposed to have made was used through police brutality.*"

(emphasis supplied). (Tr. 40–41).

At that point, Judge Sodaro stated as follows:

"Gentlemen, what has been alluded to here—there exists the possibility that I may have to rule upon the admissibility of certain statements that may have been made by this accused to the police. And this is not the proper time to pass on the legality or the propriety or the admissibility of these alleged statements, but that determination will have to be made during the course of the trial and that out of the presence of the jury, and will not be grounds now to suppress the statements of this preliminary procedure. . . . there again I will have to pass upon the admissibility of that evidence after hearing all of the testimony out of the pres-

ence of the jury to make that determination. So again none of the grounds which he has been alleging now causes me to do anything but deny the motion to suppress at this time."

(Tr. 41–42).

At that stage of the proceeding, therefore, the petitioner had testified he was a drug addict and was undergoing withdrawal symptoms at the time he made the statements to police and Detective Moore had testified that petitioner did not appear to be suffering from narcotic withdrawal symptoms on the morning of May 22, 1970, but had requested medical assistance.

Midway during the trial, Judge Sodaro held a hearing out of the presence of the jury on the admissibility of the petitioner's statements to the police. Of course, Judge Sodaro was already aware of what the petitioner had said and what Detective Moore had said at the hearing on the pretrial motions. Out of the presence of the jury, Detectives Moore and Corbin were questioned about the circumstances under which the two statements were made to them by the petitioner on the morning of May 21, 1970 at approximately 5:10 a. m. and on the morning of May 22, 1970 at approximately 2:30 a. m. Petitioner's trial counsel did not ask Detective Corbin whether petitioner had requested medical treatment before Judge Broccolino as Detective Moore had previously testified that he did, and furthermore did not ask any question of Detective Corbin concerning the apparent medical condition of the petitioner (Tr. 259–269). Petitioner's trial counsel did not ask Detective Moore again about the request of petitioner for medical treatment nor about the petitioner's apparent medical condition (Tr. 276–280).

In response to Judge Sodaro's question of petitioner's trial counsel as to whether the defense wished to offer any testimony " . . . on the issue of admissibility of any alleged statement that may have been made by [the] accused" (Tr. 281), the lawyer, after conferring with the petitioner, replied that the defense had no evidence to offer as to "voluntariness" (id.).

The judge, noting that the evidence was uncontradicted that the defendant was not mistreated and that whatever had been said to the police was freely and voluntarily said without any threats or promises, found the statements to be admissible (Tr. 281).

The scenario was repeated after the jury was brought back in the courtroom. The trial counsel of the petitioner again questioned Detectives Moore and Corbin, but did not ask them any questions relative to the apparent medical condition of the petitioner on May 21, 1970 or on May 22, 1970 (Tr. 304–307, 318–320).

When Detective Corbin testified before the jury concerning the substance of the statements which had been made by petitioner to the police, petitioner's trial counsel again failed to ask questions concerning his apparent medical condition (Tr. 383–385). Finally, trial counsel did ask a question of Detective Corbin relating to any apparent influence of alcohol or drugs on the petitioner during the time when the initial statement was being given to the police. The testimony went as follows:

"Q: Detective Corbin, when you first came into contact with John Kelly on May 21, of last year, did he appear to you to be under the influence of alcohol?

A: His appearance to me, this is only an opinion, as if he may have had something, but I couldn't determine what.

Q: Did he appear to be under the influence of any drug or narcotic?

A: His appearance to me was in a slight, I wouldn't say stupor, but his appearance wasn't quite normal. That's my own opinion.

\* \* \* \* \* \*

Q: Detective Corbin, if this young man appeared to you to be not quite normal to you that morning, why did you question him?

A: As I said before, counselor, his appearance to me is one thing. There's a lot of things that can appear to be one way, but it does not necessarily mean or designate a person or persons I am speaking to is under the influence of alcohol or drugs. (Tr. 392–394).

In response to another question of petitioner's counsel, Detective Corbin said that he saw no fresh marks of any kind on the body of the petitioner although he examined him. (Tr. 395).

At the conclusion of the defense case, petitioner's trial counsel, on the record, asked petitioner if there was anything that he had asked counsel to do which counsel had not done in response to which the petitioner stated at the bench:

"I asked you to establish the marks on the arms. I asked him to go to the blood bank and establish the marks, because I was a drug addict at the time I was arrested and he didn't do so." (Tr. 422).

When Judge Sodaro stated that the fact that he was a drug addict had nothing to do with the case, the petitioner stated that it did, ". . . *because the alleged statement that Officer Corbin said I made were untrue.*" (Emphasis supplied ) (Tr. 422).

At the same bench conference, the petitioner acknowledged that he freely and voluntarily decided not to take the witness stand to testify in front of the jury. (Tr. 420–21).

At the evidentiary hearing on October 27, 1978 before this court, the petitioner testified that he had been going through withdrawal symptoms from heroin at the time that he was picked up in the early morning of May 21, 1970 stating that he only signed the waiver of rights forms on May 21 and May 22, 1970 because he thought they were release forms to allow him to go to the hospital. He went on to testify that he had told the police officers that he wanted medical attention but that he never received it. He further testified that he had told his lawyer, Mr. Richards, that he was a heroin addict and also took pills and that he was going through withdrawal symptoms when he was questioned by the detectives. He further testified that he told his lawyer that the detectives had seen track marks on his arms. The petitioner's testimony at the evidentiary hearing in this court was to the effect that his lawyer kept telling him that there was no need to bring up the issue of his having drug withdrawal sickness because it had no relevancy to the case. Petitioner stated that he tried to tell the Judge that he was not satisfied with the actions of his lawyer with reference to the question of the drug withdrawal and the effect upon the case. He also testified that he did not testify at the trial on the advice of his lawyer.

At the October, 1978 evidentiary hearing, Mr. Richards, petitioner's trial counsel, testified that Kelly never told him at any time that he was a narcotic addict or an alcoholic, and that he was not told that he was sick nor that he had vomited on the street when being brought to Central District Station in the early morning of May 21, 1970. He further testified that he did not visit the "blood bank" because ". . . in my opinion they had nothing to do with this case." He further testified that he made no effort to investigate whether Kelly was going through withdrawal symptoms because Kelly never told him that he was.

At the October, 1978 evidentiary hearing, Mr. Richards did not indicate that his actions on behalf of Kelly, in not having Kelly testify at the suppression hearing on the issue of voluntariness and in not arguing the alleged withdrawal sickness as a basis for suppression of the statements were trial tactics. On the contrary, Mr. Richards stated that he was never told by Kelly that he was claiming that he was suffering from withdrawal at the time statements were made. This court, however, after listening to the testimony at the evidentiary hearing on October 27, 1978 and after reviewing the trial transcript, concludes as a factual matter that Mr. Richards did know prior to the beginning of the testimony in the trial, at the very least, that the defendant was claiming that he was suffering narcotics withdrawal and that, therefore, the statement which was given to Detectives Moore and Corbin to which they testified was "untrue." This court has concluded as a factual matter, that either Mr. Richards did not recognize the potential significance of Kelly's claim that he was undergoing withdrawal symptoms on the admissibility of the statements or, alternatively, that he did

not believe what Kelly was telling him and doggedly refused to assist Kelly in presenting that issue to the court.

Although produced in a disjointed manner, Kelly's counsel did at his criminal trial obtain answers to questions which established that Detective Moore heard Detective Corbin tell Judge Broccolino that the petitioner wished medical treatment and that Detective Corbin felt that petitioner's appearance on the morning of May 21, "wasn't quite normal." Combined with the statement of Kelly that he was sick, such information could have been the basis for an argument for suppression of the statements. That argument was never put before Judge Sodaro by Kelly's trial counsel. Although the argument may have had small chance of success, this court is unable to say that it had absolutely no chance of success. Under the circumstances, it was not the function of trial counsel to disregard entirely what his client was telling him because of his low opinion of the credibility that such relevant and admissible testimony of his client might have in the eyes of the Judge who was ruling on the question of admissibility of the statements.

 In short, this court finds that, in this instance, the assistance rendered Kelly by his trial counsel was incompetent, that his incompetence lead to the failure of Kelly to testify at the suppression hearing and the failure of the presiding Judge to have presented to him a legal argument justified by the contentions of Kelly which conceivably could have resulted in the suppression of the statements.

However the court's analysis is not ended by this finding of incompetence. In the context of the failure of Kelly's trial counsel to pursue the issue of his alleged drug withdrawal sickness and its relationship to the admissibility of the inculpatory statements, the second step of the three part analysis previously discussed, rather than requiring the petitioner to show that he suffered the loss of potentially useful evidence, requires a showing that potentially harmful evidence was, as a matter of law, wrongly introduced against him. If the events, as described by petitioner leading up to his statements to the police, did not occur as he described them or did not as a matter of law make his statements inadmissible in evidence under the strictures of the Fifth, Sixth, and Fourteenth Amendments, then the second step of the three part analysis has not been fully met by petitioner.

In view of the unique position of a judicial officer in the determination of the admissibility of a custodial statement by a defendant, *Lego v. Twomey*, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1971), the situation presented here is not the normal one in which, having concluded that material was not presented to the fact finder as a result of incompetent acts or omissions of counsel, the court is precluded from assessing the weight to be ascribed to that evidence on the issue of guilt or innocence.[11] Here instead the fact finding initially in question was to be made by the trial judge as a predicate to and a part of his legal duty to rule on the admissibility of the petitioner's custodial statements.

Under 28 U.S.C. § 2254(d), this court would normally accept the findings of fact of the state court on all factual issues necessary to the determination of questions of law in a federal habeas corpus case. The state trial judge was not given the opportunity, however, to consider and resolve the presently asserted factual premise for the claim that the statements of Kelly to the police were inadmissible as a matter of law which in turn is the predicate for the claim that Kelly was potentially harmed by the incompetent acts and omissions of his trial counsel. Although an opportunity existed at the post conviction hearing for a state judge to make findings of fact relevant to the admissibility of the statements to the

11. Cf. *McQueen II*, 560 F.2d 959, 961 (8th Cir. 1977) "But this is *not* to say that, on remand, petitioner must prove his innocence even by so much as a preponderance of the evidence; nor should we be understood to suggest that the Court may trespass upon what properly would have been the jury's province of weighing the truth or falsity of this evidence at the original trial." (emphasis supplied).

extent pertinent to the competency of counsel claim, it appears that the opportunity was not utilized. This court has previously attempted to reconstruct the factual findings of the post conviction judge in a manner similar to that approved in *LaVallee v. Delle Rose*, 410 U.S. 690, 93 S.Ct. 1203, 35 L.Ed.2d 637 (1973), but has been unable to do so.[12]

Since the matter of the alleged heroin withdrawal sickness of the petitioner and the effect thereof as a matter of law on the admissibility of the statements to Detectives Moore and Corbin has not been explicitly ruled upon by a judge, State or Federal, up to this time, it is now incumbent upon the court to make the necessary ruling, which of necessity is a combined question of law and fact, *Lego v. Twomey, supra* ; *see LaVallee v. Delle Rose*, 410 U.S. 690, 701 n.2, 93 S.Ct. 1203, 35 L.Ed.2d 637 (Marshall, J., dissenting).

█ The court is unable to conclude by a preponderance of the evidence, after reading the trial and post conviction transcripts as well as after consideration of the testimony of the petitioner on October 27, 1978, that the petitioner involuntarily and unintelligently waived his rights in making his statements to the police officers or that his statements themselves were involuntarily made under psychological or other duress.

The police officers testified that Kelly, while not appearing normal, did not appear to be under the influence of drugs or alcohol. They said that Kelly read, signed, and said he understood the *Miranda* waiver forms on two separate occasions (PCPA tr. 32–34, 47–48). Detective Moore said Kelly never said he was ill to him, nor did he at any time indicate he was undergoing narcotic withdrawal sickness (PCPA tr. 48–50). According to Detective Moore, no one told Kelly that he had to sign the *Miranda* waiver forms before he could go to the hospital (PCPA tr. 47). At the post conviction hear-

ing, Detective Moore was not directly asked whether Detective Corbin told Judge Broccolino that Kelly had said he wanted medical attention but did testify that he, Detective Moore, did not tell Judge Broccolino that Kelly was ill (PCPA tr. 54). Detective Corbin said he did not see any needle marks on Kelly (PCPA tr. 41) and that Kelly never stated he was sick nor did he appear to be ill in any way (PCPA tr. 34). Detective Corbin at the post conviction hearing repeated his difference with Detective Moore which surfaced at the trial that he, Corbin, was not present at the hearing before Judge Broccolino (PCPA tr. 37).

Kelly testified at the hearing in this court on October 27, 1978 that he was very sick with chills, pain, vomiting and loose bowels while he was at the Central District Station on May 21 and 22, 1970. He also testified, contrary to what he said at the post conviction hearing, that the two *Miranda* waiver forms were presented to him on two different days and that he signed them on two different occasions because he was told by Detective Corbin that the paper was a form to sign "so we can take you to the hospital". This inconsistency in the testimony of petitioner [13] causes the court to conclude that his testimony is not credible on the important issue of the extent to which he was acting involuntarily and unintentionally in making the inculpatory statements to Detective Moore and Corbin.

The petitioner, as previously, discussed, has the burden of establishing that he was deprived of potentially useful evidence or, in this unique context, showing that his custodial statements were unconstitutionally admitted. Having failed to sustain this burden the writ of habeas corpus must be denied.

Therefore it is this 9th day of March, 1979 by the United States District Court for the District of Maryland ORDERED:

1. That the plaintiff's petition for a writ of habeas corpus be denied.

---

12. See Order of April 28, 1978 (Paper # 8).

13. At the post conviction hearing, Kelly testified that *he signed both waiver forms at the same time* approximately 2:30 a. m. on May 22, 1970, after being told by the police officers that

"the only way they [could] help me [was] if I sign these for going to the hospital, and by me being under withdrawal and mental strain I signed these." (PCPA tr. 17–19).

2. That judgment be entered for the defendant.